OTTUMWA PRODUCTION CREDIT
ASSOCIATION, Appellee,

v.

KEOCO AUCTION CO., a Corporation,
Appellant,

v.

Robert E. BURTON and Edna Burton,
Third-Party Defendants.

No. 83–181.

Supreme Court of Iowa.

April 11, 1984.

Rehearing Denied May 10, 1984.

H. Michael Neary of Gerard & Neary, Sigourney, for appellant.

Richard J. Gaumer of Webber, Gaumer & Emanuel, P.C., Ottumwa, for appellee.

Considered by UHLENHOPP, P.J., and HARRIS, LARSON, CARTER, and WOLLE, JJ.

LARSON, Justice.

The issue in this case is whether the Keoco Auction Co. (Keoco) is liable in a conversion action by the Ottumwa Production Credit Association (P.C.A.) for selling hogs in which the P.C.A. claimed a security interest. The district court held that the P.C.A. retained a valid security interest despite Keoco's argument that it had been waived by the P.C.A. when it consented to the sale. The court also held that the Packers and Stockyards Act, 7 U.S.C. § 205 (1982), provided no relief for the auction company. Judgment was entered against Keoco, which has appealed. We reverse and remand for judgment for Keoco.

Robert Burton, who is not a party to this appeal, had been a customer of the P.C.A. since approximately 1972. P.C.A. provided capital for Burton's operation and took a security interest in his livestock, including hogs. Under the financing arrangement with P.C.A., an initial inventory was taken by, or at least verified by, the P.C.A. which would then schedule the repayment to coincide with maturity of the livestock. The general practice for P.C.A. was to permit its borrowers, including Burton, to sell the livestock or crops in which it had a security interest and remit the amount of net proceeds (sale price less expense of sale). An officer of the P.C.A. testified that it was not normally its practice to require joint checks when collateral was sold by its borrowers. He testified that

> [i]t's a practical matter of doing business. If you had everybody make joint checks, I guess our better loans would not finance with us.... We're in direct competition with banks, and it's not competitively compatible, I guess you should say.

This arrangement worked satisfactorily in Burton's case until it became apparent to P.C.A. in the spring of 1977 that Burton had been selling collateral without accounting for the sale proceeds. Personal contacts were made and letters were written to Burton by officers of the P.C.A. in an attempt to get him to comply with its repayment procedure. These efforts were unsuccessful. Finally, Burton was advised to "liquidate" P.C.A.'s collateral or obtain other financing. Failing to do so, he was advised, would result in the matter being referred to P.C.A.'s attorney. Still no payments were forwarded, and suit was commenced to collect the loan balance.

In the course of the P.C.A.-Burton lawsuit, it was discovered that Burton had sold hogs on several occasions through Keoco, a local auction company. While the hogs were sold in the names of "Roth Farms," "Doug Wilson," or "Gary Wilson" it is undisputed that they actually belonged to Burton and were part of the collateral listed in P.C.A.'s security agreement. P.C.A. sued Keoco for conversion. Keoco cross-petitioned against Burton. A default judgment was entered against Burton, and the cross-petition is not involved in this appeal.

An auctioneer who sells property covered by a security interest is liable for conversion, even though he is unaware of the seller's lack of authority to sell.

> According to the overwhelming weight of authority, an auctioneer who sells property in behalf of a principal who has no title thereto or who holds the property subject to a mortgage or other lien, or who for other reasons has no right to sell such property, is personally liable to the true owner or mortgagee for conversion regardless of whether he had knowledge, actual or constructive, of the principal's lack of title or want of authority to sell, in the absence of facts creating an estoppel or showing acquiescence or consent on the part of the true owner or mortgagee.

(Footnote omitted.) Annot. 96 A.L.R.2d 208, 212 (1964). *Accord,* 7 Am.Jur.2d *Auc-*

*tions and Auctioneers* § 69 (1980); 7A C.J.S. *Auctions and Auctioneers* § 24 (1980). *See Birmingham v. Rice Bros.*, 238 Iowa 410, 412–13, 26 N.W.2d 39, 41 (1947).

Iowa Code section 554.9306(2) (1981), embodying section 9–306(2) of the Uniform Commercial Code, provides:

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise*, and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis added.)

It is undisputed that the hogs in question were originally part of the P.C.A.'s security. It was also undisputed that their sale had not been authorized in the security agreement which in fact prohibited the sale of any collateral:

IMPAIRING SECURITY INTEREST: The Debtor will not sell, lease, exchange, waste, or remove the collateral from the county above specified or otherwise dispose of the collateral or execute any financing statement covering this collateral or create any security interest in the collateral except that created by this agreement, without the written consent of the Secured Party.

Keoco argues that the prohibition against sale, and the continuation of P.C.A.'s security, had been waived under the "or otherwise" language of section 554.-9306(2).

■ Implied waiver of a security interest has been recognized in two of our U.C.C. cases. In *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252 (Iowa 1975), it was held that the plaintiff bank's security interest had been waived by its prior course of conduct in allowing its borrower to sell livestock. We noted that

there is substantial evidence to support the trial court's finding that, from the very beginning of plaintiff's relationship

with Eckley [the borrower], sales of livestock pledged as collateral were made to various dealers. Plaintiff had knowledge of this, raised no objection, accepted checks from these sales for credit to Eckley's account, and clearly relied on Eckley's honesty to properly account for the proceeds. This established a course of dealing from which the trial court could find, as it did, implied authority to sell to defendants in the challenged transactions.

*Id.* at 255. The express prohibition against sale contained in the bank's security agreement was held to have been overridden by this course of conduct, amounting to an authorization of sale under the "or otherwise" language of section 554.9306(2).

In the earlier case of *Lisbon Bank and Trust Co. v. Murray*, 206 N.W.2d 96, 98 (Iowa 1973), we had affirmed the court's finding of a waiver, noting that

[a]t trial the bank acknowledged a general course of dealing, notwithstanding the security agreements, permitting [Meier, the borrower] to sell collateral and apply the proceeds either to substitutions or on the notes. The bank admitted Meier accordingly sold hogs and horses on several prior occasions but denied he was authorized to sell cattle.

The P.C.A. does not challenge the principle of implied waiver of *Hedrick Savings Bank* and *Lisbon Bank and Trust*. Indeed, the principle of implied waiver of a security interest, based on previous course of conduct, is well established. *See, e.g.*, U.C.C. § 9–306; 3 U.L.A. 441–42, comment 3 (1981); Annot. 97 A.L.R. 646 (1935); 79 Supp.C.J.S. *Secured Transactions* § 81 (1974).

The P.C.A. merely asserts that since this was a law action and the trial court's findings have substantial support in the record, the finding of no implied waiver is binding on appeal. *See* Iowa R.App.P. 14(f)(1). In this case, the court found that, despite a "practice [by Burton] ... of delivery of various livestock to sale barns and auction companies and receipt of the proceeds thereof without returning the gross pro-

ceeds to directly apply on the amount of the loan" there was no "course of dealing" which "consented to or precluded [P.C.A.'s] right to recovery." The court noted that Burton had a duty of "full disclosure" to the P.C.A., so it "would then have been in a position to elect to consent or to enter into conduct which could be found to be a 'course of dealing' authorizing sale and release of proceeds." Any consent, it concluded, was also conditioned on Burton's payment of the sale proceeds to P.C.A.

■ While the court appeared to require a heightened level of disclosure and informed consent not required for application of the implied waiver principle, we assume for purposes of appeal that the principle was properly applied and that substantial evidence supports the court's finding. Nevertheless, we believe the security interest of the P.C.A. was expressly waived. In contrast to *Hedrick Savings Bank* and *Lisbon Bank and Trust,* the consent to sell here was not merely implied through a past course of conduct involving other collateral. P.C.A. expressly consented to the sale; in fact, it had directed Burton to "liquidate" his inventory, including these hogs, and to apply the proceeds on his loan. It was clear this was to be done by Burton, through normal sale channels and not by the P.C.A. through its enforcement procedures.

P.C.A.'s problems with Burton, the trial court found, began in about 1977, over a year before the first of the sales in question. Burton was selling collateral without remitting to P.C.A. The court found that "[t]his practice continued through the year 1977 and on into the following year, 1978 [when these hogs were sold]. The plaintiff discussed this situation with Robert Burton on various occasions; [P.C.A.] issued a number of communications to him, and eventually, in the summer of 1978, advised him to secure other financing."

On November 21, 1977, approximately four months before the first of the sales through Keoco, P.C.A.'s branch manager wrote to Burton:

Dear Bob:

In September, after determining that your hog program was not profitable, it was mutually agreed that an orderly liquidation would begin taking place. Specific emphasis was placed on turning in sales proceeds at point of sale as a method of minimizing interest and as a requirement of the loan. As of this date our projections indicated that $43,335 would be applied on your loan, however, we have received no repayment. This cannot be allowed to continue. I will expect the gross amount of dollars you have taken in since the renewal was initiated to be applied against your loan immediately. I will also need a current inventory of livestock on hand. I feel these steps will need to be taken prior to November 30, 1977. Failing to comply with these requirements will leave me no other choice than to turn this loan over to our attorney.

Sincerely,
Charles R. Celania
Branch Office Manager

The branch manager again wrote on March 27, 1978, just a few days before the first of the series of Keoco sales:

Dear Bob:

As of our last conversation, December 2, 1977, you indicated that you had several bunches of feeder pigs ready to go as well as some sows and cattle. As of this date, we have received no repayment. We will expect to receive the gross proceeds of your sales no later than April 7, 1978, as well as an up-to-date listing of all livestock still on your farm.

Sincerely,
Charles R. Celania
Branch Office Manager

It is clear the P.C.A. was pressing for repayment of its loan through sale of collateral by Burton. On April 20, 1978, the P.C.A. had received no repayment as requested in the earlier letters. At this time the manager asked Burton to take his business elsewhere.

■ The P.C.A. contends that, even if it did consent to the sale of these hogs, it was

conditioned on Burton's payment to P.C.A. When Burton failed to pay the P.C.A., the condition failed and the consent became inoperative, according to P.C.A.'s argument. It is undisputed that Burton agreed to pay the sale proceeds to P.C.A. The issue is whether a consent to sale may, in effect, be rescinded if a condition subsequent, *i.e.*, failure to remit to P.C.A., occurs.

 In *Lisbon Bank and Trust*, we addressed this issue:

> This principle [of waiver] is unaffected by a finding such as was made here that the authority to sell was conditioned upon the debtor's agreement to apply the proceeds to the debt:
>
>> Where the sale of mortgaged property is made with the consent of a person authorized to give such consent, any failure of the mortgagor to live up to an agreement he made relating to accounting for the proceeds does not affect the waiver of the lien. *United States v. Hansen*, 311 F.2d 477, 480 (8th Cir.1963).

*Id.*, 206 N.W.2d at 99. The rationale of this rule is that, when a secured party waives its lien, the personal obligation of the debtor is substituted for the collateral. *Id.*

In *Producers Livestock Marketing Ass'n v. John Morrell & Co.*, 220 Iowa 948, 263 N.W. 242 (1935), we noted the general rule:

> When a mortgagee's consent to a sale by the mortgagor is given on condition, the condition must be performed in order to render the consent a waiver of the mortgage lien as between the parties, or as against a purchaser who was a party to the condition or had knowledge thereof, as where consent is given on condition that the proceeds of the sale be applied on the mortgage debt, or that the mortgage debt should first be paid; but nonperformance of a condition imposed on a mortgagor will not affect the rights of a purchaser who does not participate therein, or have knowledge thereof, because an agreement to allow a mortgagor to sell and turn over the proceeds is

a substitution of his personal obligation for the mortgage security.

*Id.* at 952, 263 N.W. at 244 (quoting 11 Corpus Juris, p. 624, § 339). *See also Hoyt v. Clemans*, 167 Iowa 330, 333, 149 N.W. 442, 443 (1914); *North Central Kansas Production Credit Ass'n v. Washington Sales Co., Inc.*, 223 Kan. 689, 697–98, 577 P.2d 35, 41 (1978) (conditional waiver of lien, auctioneer not liable for conversion); *Clovis National Bank v. Thomas*, 77 N.M. 554, 560, 425 P.2d 726, 730 (1967); 14 C.J.S. *Chattel Mortgages* § 262, at 876–77 (1939) (nonperformance of condition imposed will not affect rights of purchaser or third person who does not participate therein or have knowledge, "as an agreement to allow a mortgagor to sell and turn over the proceeds is a substitution of his personal obligation for the mortgage security.")

> [T]he rule is clearly established by the following cases, that where the mortgagor is authorized to sell, and to receive the proceeds, the mortgage lien is waived, as to the purchaser, notwithstanding the failure of the mortgagor to pay over, or account for, the proceeds as agreed; ....

Annot. 97 A.L.R. 646, 660 (1935).

In this case, there was no claim that payment was to be made directly to the P.C.A. or that Keoco had knowledge of any limitations on Burton's authority to sell. Keoco had no way of even knowing they were Burton's hogs, as they were sold under other names. Any exception to the general waiver rule which might apply under circumstances where a buyer or auctioneer was required to pay the proceeds directly to the secured party, or where he knew of the conditions of the waiver, would not apply under the facts of this case. *See Lisbon Bank and Trust*, 206 N.W.2d at 99.

Our conclusion that the P.C.A.'s security was lost is an unfortunate result. Any time an innocent party must bear the consequences of another's defalcation it is unfortunate. As between these parties, however, it is the P.C.A. which must bear the loss. Its lax collection procedure, apparently adopted to maintain its own competi-

tive advantage among farm lenders, furnished an ideal opportunity for Burton to do what he did. As we said in *Lisbon Bank and Trust,*

> [t]he bank lost because it trusted Glenn Meier [its borrower] to do what he had done before when he sold collateral. Murray [the buyer] trusted his assurance the sale was free of lien. As between the bank and Murray, the law imposes the risk of loss in these circumstances on the bank.

206 N.W.2d at 99.

This disposition makes it unnecessary to address the issues raised under the Packers and Stockyards Act.

We reverse and remand for entry of judgment in favor of Keoco.

REVERSED AND REMANDED.