709 P.2d 890

**JOHN DEERE COMPANY, a Delaware corporation, Plaintiff-Appellant,**

v.

**FIRST INTERSTATE BANK OF ARIZONA, N.A., a national banking association, Defendant-Appellee.**

No. 1 CA–CIV 7054.

Court of Appeals of Arizona,
Division One, Department D.

May 9, 1985.

Reconsideration Denied Aug. 21, 1985.

Review Denied Nov. 19, 1985.

Bonnett, Fairbourn & Friedman by Jerry C. Bonnett, Phoenix, for plaintiff-appellant.

Streich, Lang, Weeks & Cardon, P.A. by Wm. S. Hawgood II, and Ellen L. Canacakos, Phoenix, for defendant-appellee.

## OPINION

MEYERSON, Presiding Judge.

This appeal involves competing claims of two creditors of the Gallo Machinery Company (Gallo Machinery). The ultimate issue presented in this dispute is whether the financing statement filed in connection with the extension of credit by plaintiff-appellant John Deere Company (John Deere) to Gallo Machinery perfected John Deere's security interest even though Gallo Machinery was not incorporated at the time the financing statement was signed and filed with the Arizona Secretary of State. The trial court ruled that as a matter of law, the pre-incorporation signing of the financing statement could not be subsequently adopted by Gallo Machinery and therefore the security interest of defendant-appellee First Interstate Bank of Arizona (First Interstate) was perfected prior to that of John Deere. For the reasons hereinafter

stated, we reverse the judgment of the trial court and remand with instructions that partial summary judgment be entered in favor of John Deere.

## I. FACTS

In the fall of 1971, Anthony J. Gallo applied for a John Deere dealership in Willcox, Arizona. Gallo intended to operate this business as a corporation under the name of Gallo Machinery Company. Prior to the filing of the articles of incorporation, Gallo executed a number of documents which were requirements of John Deere. Among these were a financing statement and security agreement. These documents were signed on November 18, 1971, and filed with the Secretary of State on December 2, 1971. The financing statement identified the debtor as "Gallo Machinery Co." and was signed "Gallo Machinery Co. by A.J. Gallo, President."

The articles of incorporation of Gallo Machinery were filed with the Arizona Corporation Commission on December 8, 1971. The company began doing business that same month. The minutes of the first board of directors meeting of Gallo Machinery reflect that Anthony Gallo was one of three initial directors and the chairman of the board, as well as the president of the company. Additionally, he was issued 500 of 501 shares of stock.

Gallo testified in his deposition that when he signed the financing statement he intended to do so on behalf of Gallo Machinery. The board of directors of Gallo Machinery also passed a resolution which provided that Gallo was "authorized to contract and execute any and all necessary documents to secure the ownership and rights to a John Deere dealership for Willcox and related areas."

Gallo Machinery was a John Deere dealer until March, 1982. During this period, all of its purchases of John Deere products and replacement parts were made with credit supplied by John Deere. Indeed, Gallo Machinery purchased almost $50 million of goods from John Deere on credit for resale to its own customers.

In 1980, Gallo Machinery transferred its banking business to First Interstate. First Interstate conducted a credit investigation and discovered the John Deere financing statement filed in 1971. As part of First Interstate's extension of credit to Gallo Machinery, a security agreement and financing statement were executed and the financing statement was filed by First Interstate with the Secretary of State. It is undisputed that First Interstate had a perfected security interest in Gallo Machinery's inventory.

Subsequently, Gallo Machinery became financially troubled and defaulted on its obligations to both John Deere and First Interstate. John Deere attempted to foreclose upon Gallo Machinery's inventory. Because John Deere's financing statement was executed in the name of Gallo Machinery prior to the time that the company was incorporated, First Interstate claimed that it had a prior, perfected security interest in the Gallo Machinery collateral. This lawsuit then ensued. The parties filed cross-motions for summary judgment, each contending that their respective security interests were perfected prior to the other. The trial court ruled in favor of First Interstate and John Deere has brought this appeal.

## II. APPLICABLE PROVISIONS OF THE UNIFORM COMMERCIAL CODE

With certain exceptions not applicable here, a financing statement must be filed to perfect all security interests. A.R.S. § 44–3123 (current version at A.R.S. § 47–9302). The formal requisites of a financing statement are as follows:

A. A financing statement is sufficient if it is signed by the debtor and the secured party, designates by typing or printing the names and mailing addresses of both the debtor and the secured party and contains a statement indicating the types, or describing the items, of collateral. . . .

.   .   .   .   .

E. A financing statement substantially complying with the requirements of

this section is effective even though it contains minor errors which are not seriously misleading.

A.R.S. § 44–3141(A), –(E) (current version at A.R.S. § 47–9402(A), –(H)). This provision is derived from § 9–402 of the Uniform Commercial Code (UCC) and adopts "notice filing." *Plemens v. Didde-Glaser, Inc.*, 244 Md. 556, 563 n. 7, 224 A.2d 464, 468 n. 7 (1966). "The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described." Uniform Commercial Code § 9–402 official comment 2, *reprinted in* 4 R. Anderson, Uniform Commercial Code 459 (2d ed. 1971). In interpreting this provision of the UCC, courts have done so liberally "in favor of creating a security interest," *In re Sport Shack*, 383 F.Supp. 37, 41 (N.D.Ca.1974), recognizing that the purpose of the UCC is, among other things, to modernize the law governing commercial transactions, and to permit the expansion of commercial practices through custom, usage and agreement of the parties. A.R.S. § 44–2202(B) (current version at A.R.S. § 47–1102(B)).

As noted above, a financing statement must be "signed by the debtor." The UCC defines "signed" as "any symbol executed or adopted by a party with a present intention to authenticate a writing." A.R.S. § 44–2208(39) (current version at A.R.S. § 47–1201(39)). The interplay between these statutes lies at the crux of this dispute.

## III.  ANALYSIS

In support of the trial court's ruling, First Interstate contends that the financing statement executed in the name of Gallo Machinery was ineffective to perfect John Deere's security interest in the Gallo Machinery collateral. This is so, First Interstate contends, because Gallo Machinery was not in existence at the time the financing statement was signed and filed. Therefore, the bank concludes that the financing statement was not and could not have been signed by the debtor—Gallo Machinery. First Interstate makes no contention that the financing statement was "seriously misleading." [1]

The bank's argument rests upon the language of A.R.S. § 44–2208(39) which defines "signed" as "any symbol executed or adopted by a party with present intention to authenticate a writing." Because Gallo Machinery did not come into existence until the filing of its articles of incorporation, *Malisewski v. Singer*, 123 Ariz. 195, 196, 598 P.2d 1014, 1015 (App.1979), First Interstate argues that Gallo Machinery could not have had the present intent to execute the financing statement and it therefore could not have been "signed" as required by A.R.S. § 44–3141(A). [2] In our view, however, what is required is that the "party" signing the financing statement must have the present intent to authenticate it on behalf of the debtor [3] and it must appear on the face of the financing statement, *Plemens v. Didde-Glaser, Inc.*, 244 Md. 556, 564, 224 A.2d 464, 469 (1966), or from the surrounding circumstances, *In re*

---

1.  An example of a seriously misleading financing statement may be found in *Greg Restaurant Equipment & Supplies, Inc. v. Valway*, 144 Vt. 59, 472 A.2d 1241 (1984). In that case, the financing statement identified the debtor as "Ricardo's," a trade name of the debtor, Richard M. Valway. The court concluded that the trade name was materially different from the debtor's true name.

2.  This view, however, suggests that a corporation can have a "present intention." Of course, a corporation is "an impersonal entity which can only act through its officers and agents." *Miller v. Arnal Corp.*, 129 Ariz. 484, 491, 632 P.2d 987, 994 (App.1981). We fail to see how

under any circumstance Gallo Machinery Co. could sign the financing statement with a present intention to authenticate it. *But see In re Save on Carpets*, 545 F.2d 1239, 1240 (9th Cir.1976).

3.  In addition to finding support in the cases discussed above, this view is embraced in A.R.S. § 44–2540(A) (current version at A.R.S. § 47–3403(A)) which provides that a "signature may be made by an agent or other representative." Although this section appears in the negotiable instruments section of the UCC, at least one court has applied it to sustain the sufficiency of a financing statement. *In re Bro Cliff, Inc.*, 8 U.C.C.Rep.Serv. 1144, 1147 (W.D.Mich.1971).

*Great Basin Transport, Inc.*, 32 B.R. 365 (Bkrtcy.W.D.Okla.1983), that such person acted on behalf of the debtor.

Although we have found no case directly on point, courts have not applied these statutes in the literal manner suggested by First Interstate. For example, in *Sherman v. Upton, Inc.*, 90 S.D. 467, 242 N.W.2d 666 (1976), the financing statement identified the debtor as "Upton, Inc." It was signed, however, by Rodney and Janet Upton. It was contended that the financing statement was insufficient because the signatures of the Uptons appeared to be those of the "signers as individuals rather than as corporate officers." *Id.* at 670. The court found the discrepancy to be "at worst" a minor error and concluded that the financing statement was not seriously misleading. The court refused to go "back into the morass of nitpicking from which the UCC has refreshingly led us," and concluded that it was evident that Upton, Inc. was the debtor. *Id.*

Similarly, in *In re Excel Stores, Inc.*, 341 F.2d 961 (2d Cir.1965), a security agreement was signed "Excel Department Stores, by Andrew F. Machado," where the true name of the corporation was Excel Stores, Inc. In rejecting a contention that the document was not properly "signed," the court concluded that there was substantial compliance with the UCC's requirements and the document was not seriously misleading. *Id.* at 963–64.

Finally, we have found one decision which comes extremely close to the factual situation before us. *In re Wilco Forest Machinery, Inc.*, 491 F.2d 1041 (5th Cir. 1974). In that case, the financing statement was signed by Timberjack Machines, Ltd. (Timberjack), as the secured party. Timberjack had ceased to exist, however, one month earlier. The secured interest was claimed by Eaton, Yale & Towne Canada, Ltd. (EYTC). Timberjack merged with five other corporations to create EYTC. The trustee in bankruptcy for the debtor made a contention similar to that urged here by the bank. Because Timberjack was no longer in existence, the trustee argued that the financing statement was not "signed" by the secured party under Alabama's version of A.R.S. § 44–3141(A). The court rejected this argument finding that the financing statement substantially complied with the UCC's requirements because it was sufficient to put potential creditors on notice of EYTC's security interest. The court noted that Timberjack was still a division of EYTC and that the address on the financing statement was the proper address for the Timberjack division and was the location of records evidencing EYTC's security interest. Similarly, in this case, the financing statement was certainly sufficient to put creditors of Gallo Machinery on notice of John Deere's security interest. The financing statement identified Gallo Machinery as the debtor, it listed its business address and it was signed by Anthony Gallo in his representative capacity.

The foregoing cases are instructive because they demonstrate that the courts do not dogmatically require literal compliance with the definition of "signed"—the debtor himself (or itself) need not actually sign the financing statement with the present intention to authenticate it. *See, e.g., In re Sport Shack*, 383 F.Supp. 37, 40 (N.D.Ca. 1974); *In re State Discount Furniture Co.*, 2 U.C.C.Rep.Serv. 20 (D.Conn.1964). If the definition of "signed" were applied in the manner suggested by First Interstate, then in each of the above cases the financing statements would have been deemed invalid because the actual debtor had not signed the document. So long as the present intent of the "party" signing the financing statement is to authenticate the writing, we believe that it has been "signed" within the meaning of the UCC. That is in fact the holding in *In re A & T Kwik-N-Handi, Inc.*, 12 U.C.C.Rep.Serv. 765 (N.D.Ga.1973). In that decision, the financing statement identified the debtor as "A & T Kwik-N-Handi." The signature of the debtor was "By: /s/ Thomas F. Hamlin." It was contended that the financing statement was insufficient because it was not signed by the debtor. The court held:

Mr. Hamlin signed the financing statement for the purpose of the [creditor] perfecting a security interest. He was the duly authorized agent for the [debtor]. The financing statement shows Mr. Hamlin was not signing for himself but was signing for who was said by the financing statement to be the debtor. *The financing statement reflects an intention by Mr. Hamlin to show that it was genuine and was being given to evidence a security interest obtained by the [creditor].* The evidence is devoid of anything to indicate that one searching the records ... would be misled by the signing of Mr. Hamlin.

*Id.* at 768 (emphasis added).[4]

The foregoing cases implicitly recognize that the signature requirement can be satisfied by an agent of the debtor. The UCC expressly provides that general principles of law may supplement its provisions under certain circumstances.

Unless [displaced] by the particular provisions of this chapter, *the principles of law and equity, including the law ... relative to capacity to contract, principal and agent,* estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy or other validating or invalidating cause *shall supplement its provisions.*

A.R.S. § 44–2203 (current version at A.R.S. § 47–1103) (emphasis added). Therefore, because "the law of principal and agent is preserved by the [UCC], the signing may be made by an agent of the party. Thus, it has been held that the signature on a fi-

nancing statement may be made by an agent of the debtor...." 1 R. Anderson, *Uniform Commercial Code* § 1–201:298 (1981).

■ By common law, Arizona has adopted the ratification doctrine. *Ong Hing v. Arizona Harness Raceway, Inc.,* 10 Ariz.App. 380, 385–86, 459 P.2d 107, 112–13 (1969); *see Malisewski v. Singer,* 123 Ariz. at 197, 598 P.2d at 1016. Under the ratification doctrine, the corporation is treated as having the power to ratify the pre-incorporation acts of a promoter. H. Henn, *Handbook of the Law of Corporations* § 111 at 184 (2d ed. 1970) (Henn). "The theoretical basis for this theory is the agency rule which allows a principal to ratify the unauthorized acts of one purporting to act as his agent." *Id.* Thus, under the common law which may properly supplement the UCC in a case such as this, Gallo Machinery could ratify the actions of Anthony J. Gallo.[5]

First Interstate concedes that a corporation may ratify a pre-incorporation contract, but argues that pre-incorporation "acts" such as the signing of a financing statement may not be ratified. We fail to see any reason which would support the distinction urged by the bank. The financing statement was signed contemporaneously with the security agreement as part of John Deere's conditions of establishing the dealership. If the contract granting the creditor a security interest in the debtor's goods can be ratified, surely the financing statement should also be subject to ratification. Indeed, under certain circum-

---

**4.** Among the cases relied upon by the bank is *Maine League Federal Credit Union v. Atlantic Motors,* 250 A.2d 497 (Me.1969). In that decision, the parties stipulated that the assistant treasurer intended to sign the financing statement on behalf of the credit union but had inadvertently not done so. The court held the financing statement to be insufficient because it was unsigned. The case is one of a number of decisions which simply stresses the necessity that someone, on behalf of the debtor, authenticate the "writing." *See generally Annot.,* 3 A.L.R. 4th 503 (1981). Significantly, the dispute in the case was over the failure of the debtor's agent—the assistant treasurer—to sign the financing statement.

**5.** We recognize that the ratification doctrine has been criticized. "The difficulty of applying such a rule to the preincorporation agreement is that at the time of the making of the contract, there was no principal (i.e., the corporation) in existence." Henn, § 111 at 184. Even if the ratification doctrine were not followed in Arizona, any of the theories pertaining to the adoption of pre-incorporation acts would allow us to reach the same result. *E.g., Framingham Savings Bank v. Szabo,* 617 F.2d 897 (1st Cir.1980); *see generally* 1A W. Fletcher, *Cyclopedia of The Law of Private Corporations* §§ 204–213 (rev. perm. ed. 1983).

stances a financing statement can adequately serve as a security agreement. *In re EJM, Inc.*, 1 B.R. 119 (Bkrtcy.N.D.Ga. 1979). A corporation may ratify the post-incorporation signing of a financing statement by its agent, *In re Bro Cliff, Inc.*, 8 U.C.C.Rep.Serv. 1144, 1147–48 (W.D.Mich. 1971); a pre-incorporation financing statement may also be ratified. *Cf. In re Wilco Forest Machinery, Inc.*, 491 F.2d at 1044 n. 2 (repossession action by corporation one day prior to its incorporation can be subsequently adopted "thus curing any problems regarding the lawfulness of its possession").

There is uncontradicted evidence that Gallo Machinery by its course of conduct over a ten year period implicitly ratified the conduct of Anthony Gallo in signing the John Deere financing statement. A corporation may be bound on an agreement made in its name by its promoters prior to incorporation, where the corporation subsequently adopts the agreement by express ratification or by acceptance of benefits related to it. *Bankers Trust Co. v. Zecher*, 103 Misc.2d 777, 780, 426 N.Y.S.2d 960, 962–63 (Sup.Ct.1980).

[I]f a pre-incorporation contract made by promoters is within the corporate powers, the corporation may, when organized, expressly or impliedly ratify the contract and thus make it a valid obligation of the corporation. This is especially true if the agreement appears to be a reasonable means of carrying out any of the corporate powers or authorized purposes.

*Chartrand v. Barney's Club, Inc.*, 380 F.2d 97, 100 (9th Cir.1967).

Gallo Machinery was formed by Anthony Gallo solely to operate as a John Deere dealership. In order to establish the dealership, Gallo was required to sign dealership agreements, a security agreement and a financing statement, among other documents. Gallo unquestionably signed the financing statement intending that it would be signed on behalf of the corporation. Gallo Machinery was thereafter incorporated six days following the filing of the financing statement. Gallo was elected president and chairman of the board of directors and held virtually all of the stock.

Gallo Machinery and John Deere maintained their franchise relationship for ten years. During this period Gallo Machinery purchased $50 million of goods and equipment on credit from John Deere. Each year Gallo Machinery signed new dealership agreements and several new security agreements were signed as well. We find as a matter of law that Gallo Machinery's conduct impliedly ratified the 1971 financing statement signed by Anthony Gallo.

For the foregoing reasons, the judgment entered in favor of First Interstate is reversed and this matter is remanded to the trial court with instructions to grant partial summary judgment in favor of John Deere's claim of a prior, perfected security interest. Pursuant to A.R.S. § 12–341.01, John Deere may submit a claim for attorney's fees in accordance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

GRANT and HAIRE, JJ., concur.