**FS CREDIT CORPORATION,
Appellant,**

v.

**TROY ELEVATOR, INC., Appellee.**

**No. 86–199.**

Supreme Court of Iowa.

Dec. 17, 1986.

Allan C. Orsborn of Dull, Keith, Beaver & Orsborn, Ottumwa, for appellant.

John B. Martin of Stephens & Martin, Bloomfield, for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, SCHULTZ, LAVORATO and NEUMAN, JJ.

SCHULTZ, Justice.

This appeal presents a dispute between a lienholder with a security interest, perfected under the Uniform Commercial Code, in a farmer's corn crop and the purchaser of the corn. FS Credit Corporation (FS) extends credit to farmers through its member companies to finance crop production expense. Prior to the 1982 crop season, FS approved the extension of credit to farmer Kenneth Green by one of its members, Big Three Farm Service (Big Three). Big Three then assigned its interest in the account to FS. Green signed three separate security agreements and financing statements giving the creditor a lien on all crops of the farm. Green sold his corn crop to the Troy Elevator, Inc. (Troy). FS commenced this conversion suit against Troy claiming a superior lien on the purchased corn up to the amount of Green's outstanding debt.

In its ruling the trial court relied heavily on the prior course of dealings between FS and Green; therefore, we briefly review this history. In 1980 and 1981, Green had obtained credit through FS and its member company to finance his growing of crops. Although the security agreements Green signed provided that Green would not sell the collateral without prior written approval of the creditor, FS never enforced that provision or objected to Green selling his crops without approval. Each year Green sold the crops without permission and paid off his obligation to FS.

In 1982, FS provided Green credit in the amount of $86,000 in exchange for notes, security agreements and financing statements. Prior to extending credit, however, FS required a subordination agreement from the Exchange Bank, which held a prior security interest over the same property. In November and December, Green apparently considered obtaining a government commodity credit loan on his beans and corn. The government requires that the farmer obtain a written lien waiver from the lienholder as a prerequisite to obtaining such a loan.

On November 30, an agent of Big Three executed such a waiver on Green's 1982 bean crop, authorizing payment to Green alone rather than by check payable jointly to Green and Big Three. Prior to executing the lien waiver FS agreed that the proceeds could be paid to the Exchange Bank; however, the bank guaranteed payment to FS in the amount of $40,000. The beans were later sold to Troy for the sum of $62,240 and the bank applied $40,000 on Green's obligation to FS.

On December 10, Green sought and obtained a similar waiver applicable to the 1982 corn crop allowing the payment to be made to Green, but there was an irregularity in the authorizing signature. In the appropriate place for the lienholder's signature, Big Three Farm Service was typed in and below this the plant supervisor, as agent for Big Three, signed in longhand "Big Three Farm Service." The agent did not sign his own name as agent. The plant supervisor testified that he executed this lien waiver but did not realize he was supposed to put his name on it. However, he testified it was his intention to execute and deliver to Mr. Green the lien waiver.

Again Green did not obtain the government commodity credit loan. Green sold his corn to Troy Elevator. He was paid $85,082.32, but only $34,484.53 of that amount was applied to the FS loan, leaving an outstanding balance of $32,188,51. Green had not obtained written permission from FS or its member company to sell his corn to Troy.

Following a trial to the court, the trial court dismissed FS's action. In concluding that FS impliedly waived its security interest in the Green corn by its course of dealing in 1980 and 1981, the trial court

relied on our holdings in *Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96 (Iowa 1973), *Hedrick Savings Bank v. Myers,* 229 N.W.2d 252 (Iowa 1975), and *Ottumwa Production Credit Association v. Keoco Auction Co.,* 347 N.W.2d 393 (Iowa 1984). These cases interpret Iowa Code section 554.9306(2), embodying section 9–306(2) of the Uniform Commercial Code, which provides:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

In each of the cited cases we held that the lender authorized the disposition of the collateral and waived its lien as against third parties.

In *Lisbon Bank & Trust Co. v. Murray,* 206 N.W.2d 96 (Iowa 1973), we affirmed the trial court's holding that a lender, who on previous loans had permitted the debtor to sell collateral without authorization, established a course of dealing impliedly authorizing the sale of collateral and waiving its security interest in the collateral after sale. This waiver was not affected by the debtor's failure to live up to his part of the bargain, that is, to apply the proceeds to his loan. The waiver was effective as to the third party purchaser of the collateral. *Id.* at 99.

The holding in *Lisbon Bank & Trust,* however, was limited in that there was no express contract provision in the security agreement which provided that the debtor could not sell the collateral without permission of the creditor. The question of the effect of such a contract provision was reached by the court in *Hedrick Savings Bank v. Myers,* 229 N.W.2d 252 (Iowa 1975), because the security agreement involved in that case contained a provision which required written authorization before the debtor could sell the collateral. *Id.* at 253–54. We held that, despite the viola-

tion of an express contract provision, the facts concerning previous sales without permission were sufficient to establish a course of dealing from which the trial court found implied authority to sell. Thus, we held that a prior course of dealing may constitute authority to sell pledged collateral under section 554.9306(2). *Id.* at 256. We recognized that there was a split of authority on this proposition among other jurisdictions. *Id.* at 255. We adopted the policy that as between the two parties who trusted the debtor to handle correctly the proceeds from the sale of pledged collateral, the creditor must bear the risk of loss. *See Lisbon Bank & Trust,* 206 N.W.2d at 99.

This policy was reiterated in *Ottumwa Production Credit Association v. Keoco Auction Co.,* 347 N.W.2d 393 (Iowa 1984), when we reflected that it was an unfortunate result when an innocent party must bear the loss of a debtor's defalcation, but reasoned that, as between the creditor and an auctioneer who sold the collateral, the creditor must bear the loss that was a result of its own lax collection procedure. *Id.* at 397. We held that the creditor, in telling the farmer to liquidate the collateral and pay off his loan, orally authorized the sale, thus waiving the condition in the security agreement that required written consent. *Id.* at 396–98.

In the present case, FS maintains the trial court was wrong in relying on the parties' course of dealing in the previous years because of a new provision in the 1982 security agreement. All of the security agreements signed by Green contained an express provision that the debtor could not dispose of or encumber the collateral without the express written consent of the secured party. The 1982 security agreement, however, contained an additional provision which goes on to state, "[A]ny waiver by the company of this paragraph or failure to require prior written consent shall in no way operate as a waiver of patron's obligations hereunder for any future sale, transaction, or event." FS urges that this additional language precludes the

court from considering prior course of dealings between the parties and finding a waiver based upon that prior course of dealing. The trial court rejected this contention reasoning that the additional language "is merely an attempt by FS to continue its inadequate practices concerning collateral and at the same time avoid the sound public policy behind the rulings" in the previously cited cases.

On appeal we first must determine whether the additional language can affect a debtor's reliance on a previous waiver, by course of dealing, of a contract clause requiring written consent to sell collateral. Because we believe the new terms interrupt the debtor's reliance on past dealings, we cannot agree with the trial court's holding that the condition was waived. The remaining issue is whether there has been implied waiver by subsequent conduct or express waiver.

■ *I. Effect of additional language on previous course of dealing waiver.* We believe that the trial court's failure to give any consideration to the additional and new language in the 1982 agreements is error. One who has waived a condition in a contract may withdraw the waiver, so long as the other party is afforded a reasonable opportunity to perform the conditions of the contract that had been waived. *See Dunn v. General Equities of Iowa, Ltd.,* 319 N.W.2d 515, 517 (Iowa 1982); *Bettis v. Bettis,* 228 N.W.2d 193, 195 (Iowa 1975). Thus, the condition of the contract that was waived by a course of dealing may be reestablished by giving reasonable notice that the condition will be enforced in the future. FS gave such notice here. The additional terms of the 1982 agreements give notice that the written consent condition will apply on future sales, despite past waivers of the condition.

In the present case we have not just a reestablishment of a waived condition in an ongoing contract; we have an entirely new contract, giving notice that the debtor may no longer rely upon previous implied waivers of prior contract provisions. The plain message of the new provision in the 1982

security agreement is that past failure to require written consent does not excuse a failure to obtain written consent under the new contract. Green did not claim that he was unaware of the change in the contract, nor is there any claim that the additional provision is unconscionable or void on any other grounds. Green had notice of the terms of the contract at the time it was executed. We believe that this is reasonable notice that FS would not be bound by past waivers or by its previous conduct. Under these circumstances we believe that as a matter of law the trial court erred in relying solely on FS's conduct in prior years to find a waiver of the condition that requires prior written permission to dispose of collateral.

■ *II. Effect of additional language on future waivers.* Our determination that the additional language in the 1982 agreement served as a withdrawal of the previous waiver of a condition in the contract does not completely dispose of this appeal. Still unresolved is the question whether FS waived the notice requirement after the execution of the new contract. We do not believe the trial court addressed this problem.

First we consider whether FS by its activities in 1982 impliedly waived its security interest in the corn. FS claims that the express language of the security agreement should control and that the additional provision, which precludes a finding of waiver based on the prior course of dealing, prevents any finding of implied waiver of the terms of the contract. The problem is whether an express revocation of waiver precludes any finding of implied waiver arising from *subsequent* conduct that otherwise would constitute a waiver of the very same condition. Applied to this appeal, can the parties to the 1982 security agreement effectively agree that future conduct and course of dealing cannot constitute a waiver of a provision requiring written consent before sale of the collateral? We think not.

A contract provision that prohibits waiver of a contractual right may be waived by

a party when the anti-waiver provision was included for that party's benefit. *See J.E.M. Enterprises, Inc. v. Taco Pronto, Inc.,* 145 Ga.App. 573, 244 S.E.2d 253, 255 (1978); *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8, 14 (Mo.App.1972); *Soltis v. Liles,* 275 Or. 537, 551 P.2d 1297, 1300 (1976). Our court stated in *Bricker v. Great Western Accident Association,* 161 Iowa 61, 64, 140 N.W. 851, 852 (1913), that a "party may waive any provision of a contract made for his benefit." We held that a creditor by its conduct may waive a contract clause which provides that the acceptance of past due installments shall not be a waiver of forfeiture. *Id.* at 65, 140 N.W. at 855. As one commentator notes:

> Parties to a contract can not, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement. An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary. In like manner, a provision that an express condition of a promise or promises in the contract can not be eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective. The promisor still has the power to waive the condition, or by his conduct to estop himself from insisting upon it, to the same extent that he would have had this power if there had been no such provision.

A. Corbin, *Corbin On Contracts* § 763, at 531 (1960).

Because we believe that FS could waive the conditions of its contract, we now turn to determine whether there is sufficient evidence in the record to substantiate a holding that Troy met its burden of proof to show waiver. Our review of the record indicates there is substantial evidence upon which the finder of fact could make this determination. The record contains extensive evidence concerning the dealings of the parties before and during the year 1982. It is for the trier of fact to determine the credibility of the witnesses, the weight of the evidence, and the inferences to be drawn from the evidence in resolving disputed fact issues. The evidence as to the course of dealings of the parties in 1980 and 1981 alone is insufficient to show waiver, because Green received notice by the additional terms of the new security agreement that FS intended to change its practice. This evidence could be used, however, to show that FS in fact did not change its position in 1982, but continued its past practice of allowing the sales of the collateral without requiring written permission.

We also believe that the matter of express authorization for the disposition of the corn is a viable issue. The trial court indicated "the evidence supports the finding that FS did not expressly waive its security interest in Green's corn"; however, the court made no such express finding. There was testimony by Green and by the plant supervisor for the member company, who was authorized to sign waivers, as to whether the supervisor intended to release FS's lien. We have always recognized both oral and written contracts. Likewise, a condition in a written contract may be waived orally.

A lien waiver covering the corn was executed. The trial court indicated that this was not an effective lien waiver. It is true that the waiver was not signed by an agent; however, it contained the written name of the member company. We believe that the manner in which the waiver was signed raises a fact question whether there was a present intention to authenticate the instrument on behalf of the corporation. If the agent had an intent to sign the corporate name and bind the company, we believe that the signature even without the agent's name is sufficient. *See In re Bufkin Bros.,* 757 F.2d 1573 (5th Cir.1985); *In re Sportshack,* 383 F.Supp. 37 (N.D.Cal. 1974); *John Deere Co. v. First Interstate Bank,* 147 Ariz. 256, 709 P.2d 890 (1985).

FS urges that the purpose and a condition of the lien waiver was that the producer would obtain a loan from the government. The provision also allowed Green to

sell the commodity to the government, however, and authorized payment to Green. If the lien waiver was executed, the limited purpose of the waiver is irrelevant. This situation is analogous to the one in *Ottumwa Production Credit Association v. Keoco Auction Co.*, 347 N.W.2d 393 (Iowa 1984), in which the creditor expressly authorized the sale of collateral for the limited purpose of paying off the loan in question. We said that the failure of the farmer to abide by his agreement to pay off the loan did not affect the operation of the waiver as to third party buyers. *Id.* at 396–97. Similarly, in our case, the failure of Green to obtain a commodity credit loan or later to sell his corn to the government does not change the effectiveness of the waiver as to third party purchasers. This is, if anything, a stronger case than *Ottumwa Production Credit;* here, the waiver not only permitted Green to dispose of his corn, it also allowed him to obtain a check for the proceeds made out to himself alone and not to Green and FS jointly. Thus, if the trial court finds that the waiver was executed, it is effective as to all third party purchasers.

FS also urges that the agent did not have actual authority to execute such a lien waiver. Again, this is a fact question, which must be determined by the trial court. We believe that it is also for the trier of fact to determine whether or not the agent acted within the apparent scope of his authority. We have explained liability arising from the apparent authority of an agent as follows:

> The liability of the principal for the acts and contracts of his agent is not limited to such acts and contracts of the agent as are expressly authorized, necessarily implied from express authority, or otherwise actually conferred by implication from the acts and conduct of the principal. All such acts and contracts of the agent as are within the apparent scope of the authority conferred on him, are also binding upon the principal. Apparent authority, or ostensible authority to do such acts or to make such contracts, is that which, although not actually granted,

has been knowingly permitted by the principal or which he holds the agent out as possessing.

*Mayrath Co. v. Helgeson*, 258 Iowa 543, 548, 139 N.W.2d 303, 306 (1966).

In summary, we hold that the trial court erred in determining that there was implied authority to sell the corn based solely on the course of dealing in 1980 and 1981. We therefore reverse. However, we remand the action to the trial court to decide this case anew on the present record, in a manner consistent with this opinion.

REVERSED AND REMANDED.