AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION; John W. Christensen; John W. Christensen, Jr.; Eric Gustafson; Gunnar E. Hanson; Gerald R. Jensen; Vernon M. Peterson; Chester G. Sjoberg; Donald N. Wieland; and Michael G. Tolzin, Appellees.

AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Appellee,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Appellant.

John W. Christensen; John W. Christensen, Jr.; Eric Gustafson; Gunnar E. Hanson; Gerald R. Jensen; Vernon M. Peterson; Chester G. Sjoberg; Donald N. Wieland; and Michael G. Tolzin.

Nos. 90–2402, 90–2445.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1991.

Decided Sept. 18, 1991.

David M. Gische, Washington, D.C., argued (Robert M. Pozin and Eleni M. Constantine, Washington, D.C. and David R. Crary, Sioux City, Iowa, on the brief), for appellant.

Maria Beatrice Valdez, Washington, D.C., argued (Robert V. Ginn, Mark J. Daly, Craig A. Knickrehm and Julia L. Gold, Omaha, Neb. and Ann S. Duross, Colleen B. Bombardier, and Richard J. Osterman, Jr., Washington, D.C., on the brief), for appellees.

Before ARNOLD, JOHN R. GIBSON, and LOKEN, Circuit Judges.

ARNOLD, Circuit Judge.

This is an insurance case. At issue is the coverage provided by two policies issued by the American Casualty Company of Reading, Pennsylvania, to the directors and officers of the Farmers National Bank of Aurelia, Iowa.

In the early 1980's the Bank's loan portfolio ran into trouble. The Bank eventually failed, and the FDIC became its receiver. In 1985 the FDIC sued nine former directors and officers of the Bank, alleging negligence in how they managed the Bank's loans. The former directors and officers sought the protection of their insurer, American Casualty. American Casualty in turn filed this declaratory judgment action against the FDIC to settle the directors' and officers' rights to coverage. After a thorough analysis of all the ins and outs of the case, the District Court decided that the bank officials were indeed entitled to coverage under two American Casualty policies, one issued in 1981 (by another insurer but assumed by American Casualty) and another issued in 1984. *American Casualty Company of Reading, Pennsylvania v. FDIC*, Civil No. 86–4018, 1990 WL 66505, Findings of Fact, Conclusions of Law, and Order for Judgment (N.D.Iowa Feb. 26, 1990). On American Casualty's motion, the judgment was amended to reflect that one Bank officer was not entitled

to coverage because of his knowledge of the exclusion at the heart of this case. Civil No. 86–4018, Order (N.D.Iowa July 13, 1990).

American Casualty has appealed the judgment. We find several legal errors, and accordingly reverse in part and affirm in part. The directors and officers are not entitled to coverage under either of these insurance policies for purposes of the FDIC's suit against them. The FDIC has filed a cross-appeal challenging several aspects of the District Court's decision. We affirm on the cross-appeal.

## I.

John Christensen, Jr., is the bank officer at the center of this controversy. The parties refer to him as Jack Christensen, and so will we. (John Christensen, Sr., the Bank's president and chairman of the Board of Directors, is his father.) Jack was the Bank's vice-president. One of his duties was to handle the Bank's insurance. In 1981, and again in 1984, Jack was the point man in applying for these insurance policies. His actions, however, were subject to the Board's oversight. It is charged by the Bank's Articles of Association with the ultimate responsibility for securing insurance. App. 213–216. Jack, then, was the Board's agent.

This case turns on the extent of Jack's authority for securing insurance. The Board seeks relief from a limitation on the coverage provided by the 1984 policy—a limitation that Jack agreed to, and as the District Court found, understood.[1] The "regulatory exclusion" was a new endorsement. It changed the terms of the directors' and officers' insurance from their 1981 policy. The exclusion provides, in part, that: "It is understood and agreed that [American Casualty] shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers based upon or attributable to any action or proceeding brought by or on behalf of the Federal Deposit Insur-

ance Corporation...." Add. 59. The lawsuit the FDIC has now brought is precisely the kind of proceeding—and potential loss—that this provision is designed to exclude. The Board members argued, and the District Court held, that Jack did not have authority to agree to this limitation on his own. They argued further, and the District Court also held, that the Board neither agreed to the new limitation, nor accepted Jack's agreement.

The extent of Jack's authority is a question of the Iowa law of agency. We are bound by the Supreme Court's decision in *Salve Regina College v. Russell*, — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), to review this state-law question *de novo*, not deferring to the District Judge's reading of the law of his own state. The Board cites cases, see *e.g.*, *Gatzemeyer v. Vogel*, 544 F.2d 988, 991–92 (8th Cir.1976), to the effect that the existence and extent of an agent's authority are questions of fact in Iowa. It is true, of course, that historical facts about what was said and done create the legal relation called "agency," as well as determine the scope of the agent's authority. *Restatement of the Law of Agency 2d* § 1 Comment b; § 7 Comment a. We may reject the trial court's findings as to those facts only if they are clearly erroneous. But the legal conclusions to which the facts lead are not so insulated from review as the facts themselves.

The Court found that Jack did not have authority—actual authority as the parties style it—to agree to the regulatory exclusion, or indeed any limitation, on his own. That finding is undoubtedly correct. Jack testified to this limit on his powers. Every Board member who testified agreed with him. The record is simply barren of evidence that Jack could, on his own, decide the terms of the directors' and officers' insurance. His authority was, in the District Court's apt word, "ministerial." Jack was the channel between the insurance company and the Bank. The Bank's appli-

---

**1.** Another exclusion, limiting coverage for suits between officers and directors and likewise new to the 1984 policy, was also asserted below by the insurance company as barring coverage for the pending FDIC suit. We do not reach this issue.

cation for the 1984 policy makes the point. "John Christensen Jr." was the officer "designated, as the agent of the Bank and of all insured Directors and Officers, to receive any and all notices from the Insurer or their authorized representative(s) concerning this insurance[.]" Add. 60. American Casualty's argument to the contrary—that, in effect, Jack was the Board for purposes of securing insurance—is, as the District Court held, misplaced.

An agent's authority, however, does not end with the powers the principal expressly delegates to him. As the District Court recognized, in addition to powers implied in a grant of authority, an agent also enjoys the authority he appears to possess, on the basis of the manifestations of the principal to a third party. *State v. Sellers*, 258 N.W.2d 292, 297–298 (Iowa 1977) (en banc); *Restatement of the Law of Agency 2d* § 8. The District Court also held that Jack did not have apparent authority to agree to the 1984 insurance policy and its regulatory exclusion. We disagree. As the name implies, apparent authority is a matter of appearances. We are left with "the definite and firm conviction," *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quotation omitted), that the Board's actions and inaction toward American Casualty with respect to these insurance policies support only one conclusion: Jack enjoyed apparent authority to bind the Board to the terms of the 1984 policy.

The following facts lead us to that conclusion. When it came time to negotiate the 1981 insurance policy, John Christensen, Sr. told American Casualty's underwriter that Jack was the person to deal with. App. 381, 900. Jack agreed to five new restrictions. The Board accepted them. The Board attempts to explain away these changes as insignificant, and as part of Jack's ministerial responsibilities. We are not persuaded. Settling on these new terms is beyond the authority of one who supposedly has power only to receive and relay information. Moreover, as American Casualty points out, the difference between a significant exclusion and an insignificant exclusion is the happenstance of later events. This prior similar act helps gird Jack with apparent authority to agree to the regulatory exclusion. *Mayrath Co. v. Helgeson*, 258 Iowa 543, 548–49, 139 N.W.2d 303, 306 (1966); *compare Fort Dodge Creamery Co. v. Commercial State Bank*, 417 N.W.2d 245, 246 (Iowa App. 1987) (per curiam) (making the point in terms of an agent's implied authority).

The Board's representations to American Casualty during the application process for the 1984 policy are also important. Jack was designated the Bank's agent. That fact was reflected on the application for coverage. It was also reflected in Jack's role as the only person at the Bank American Casualty dealt with. Nor does the requirement of a second Bank officer's signature on the application significantly diminish Jack's apparent power. No second signature was secured, in accordance with American Casualty's practice with respect to renewals. American Casualty is entitled to rely on its reasonable interpretation of the Board's actions with respect to Jack's authority. *FS Credit Corp. v. Troy Elevator, Inc.*, 397 N.W.2d 735, 739 (Iowa 1986). Finally, there is the fact of payment for the 1984 policy. The Board authorized that the premium be paid. It did so without reviewing the new policy or questioning Jack about its particulars, though the Bank officials' copy of the policy—already in effect for several weeks, which is not unusual in the industry—had been sent with the bill for the premium. App. 923. We are not prepared to agree with American Casualty that this amounted, as a matter of law, to a ratification of Jack's actions. The payment, however, further justifies American Casualty's belief that the Board approved Jack's acceptance of the new, more limited, 1984 policy. *Ibid; Sellers*, 258 N.W.2d at 297.

The District Court's contrary conclusion emphasizes two facts: the testimony of two American Casualty employees that they knew Jack did not have the last word on the new policy, and American Casualty's lack of good faith during the application process. The points are related and impor-

tant. If accurate, they detract from the reasonableness of American Casualty's reliance on the appearances of Jack's authority. Neither, however, bears the weight the District Court places on them. Steve Burgett, the underwriter for American Casualty, testified by way of deposition. When questioned about the significance of Jack's designation as the directors' and officers' agent, Burgett answered that he did not believe the designation gave Jack the final say about insurance. App. 297–98. Thomas Carr, an agent for American Casualty, gave similar testimony. He had no knowledge, beyond the agent designation, that the other directors and officers had "expressly authorized" Jack to answer for them about "important matters pertaining to [directors' and officers'] liability insurance such as new exclusions." App. 381. We agree with all of this, and our analysis of Jack's authority concedes as much. The designation is merely one of the circumstances that create Jack's apparent authority with respect to American Casualty.

From the beginning of this bench trial, the Board has argued that American Casualty was less than forthright during the application process for the 1984 policy. The Board interprets events this way. In gathering information for the new policy, American Casualty discovered that the Bank was in bad shape. It decided that there was a good chance the Bank would fail, and that an FDIC receivership would follow. It thus proposed the regulatory exception to the new policy. American Casualty then minimized the potential effect of this substantial reduction in coverage in its conversations with Jack. It also failed to emphasize that the Board could partially extend its 1981 policy by one year, instead of agreeing to the new terms. It also conveniently failed to deliver the text of the new limitation to Jack until after the new policy had been issued and the Board's old policy had expired. To top off American Casualty's improper behavior, it tripled the Board's premium for what amounted to a lot less protection.

▮ The District Court credited this description. The Court explained its refusal to find that the insurer reasonably believed Jack had authority to agree to the reduced 1984 coverage in terms of American Casualty's lack of good faith. In the first place, assuming the Board's explanation is true, it is simply not relevant to our apparent-authority analysis. The good faith required by Iowa law concerns only the third party's belief, based upon the principal's actions and inaction, about the extent of the agent's authority. *Sellers*, 258 N.W.2d at 297. The only bad faith argued by the Board concerned American Casualty's changes in the policy, not the insurer's reliance on the extent of Jack's authority. Second, and more importantly, the Board's narrative mischaracterizes the facts. Jack's notes of telephone conversations with various individuals at American Casualty demonstrate, and the District Court specifically found, that American Casualty explained the regulatory exclusion to him. App. 140. He, as the Board's admitted agent for receipt of communications, was further notified in writing that the 1984 policy would contain the regulatory exclusion. App. 141. The evidence was also uncontroverted that Thomas Carr, a representative of the insurance company, explained to Jack that the Board had the option of extending the 1981 policy instead of buying the new policy. App. 369. In addition, the Bank had the 1981 policy, which contained that extension option, in hand when it chose to renew on different terms.

It is true that American Casualty increased its premium and decreased its coverage for the officers and directors when it discovered the state of the Bank's loan portfolio. That strikes us, however, as a reasonable business decision rather than bad faith. The parties are sophisticated business people who dealt at arm's length. This transaction could have ended in several different ways. But the fact remains that the parties agreed to the terms of the 1984 policy. We will not discard their agreement and remake their business relationship.

## II.

▮ We have concluded that Jack had apparent authority to agree to the 1984

policy. As a consequence, several other issues on appeal fall away. The District Court also concluded, based on American Casualty's conduct and on the lack of information before the Board when it voted to pay the premium for the 1984 policy, that the policy was unconscionable, violated the Board's reasonable expectations, and violated an implied warranty of fitness. None of the affirmative defenses urged by the Board and accepted by the District Court can be maintained, however, in the face of Jack's knowing agreement to the policy on the Board's behalf. This agreement destroys the legal significance of the Board's own imperfect knowledge. Jack knew what the policy said. It cannot be reasonable for the Board to expect coverage clearly inconsistent with the actual knowledge of its own agent. Nor can we agree that the new contract was unconscionable. It is a bargain struck by adult business people. We have no reason to suppose that a better deal could have been gotten for the bank from any other insurer.

■ The questions of coverage under the 1981 policy are now also easily answered. The Board successfully argued below that it was entitled to coverage under the 1981 policy for two reasons. First, because American Casualty had, in effect, refused to renew the terms of the 1981 policy, the Board was entitled to exercise the so-called "discovery option" now, and extend the 1981 policy by one year. That would, after formal notice to the insurer, secure coverage for the directors and officers against the pending FDIC suit. Under Iowa law, however, agreement to new terms creates a renewal. Jack's agreement to the 1984 policy, coupled with his apparent authority, prevents the Board from securing after-the-fact coverage under the 1981 policy. *Davis v. Travelers Insurance Co.*, 196 N.W.2d 526, 530 (Iowa 1972).

■ The Board also argued, and the District Court held, that it was entitled to coverage under the 1981 policy because it gave American Casualty adequate notice of potential claims during the application process for the 1984 policy. During that process, the Bank's troubles with its loan portfolio were fully revealed. The insurer was told, among other things, that the Bank was expected to lose over $400,000 in 1983, that the percentage of Bank assets that were classified as problems totaled almost 200 per cent. of the institution's capital, and that the Comptroller of the Currency had issued a cease-and-desist order against the Bank.

The District Court held that American Casualty should, in essence, be bound under the 1981 policy by this information—the same information that caused it to fear that the Bank might fail. American Casualty's response is threefold. It argues that this holding ignores the plain language of the policy's notice provision, as well as the circumstances of the 1984 application. In addition, American Casualty points out that the District Court's conclusion that notice was in fact given during the application process contradicts well-reasoned authority from a sister circuit on nearly identical facts. See *California Union Insurance Co. v. American Diversified Savings Bank*, 914 F.2d 1271 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991). We agree with American Casualty. The communications between Jack and American Casualty do not conform to the 1981 policy's requirements. Notice of occurrences that might lead to claims had to be specific and in writing. All of this information was general, most of it was communicated orally, and all the while Jack Christensen was telling American Casualty that the Bank was in no danger. We decline to hold that the information American Casualty received during the application process was effective notice to it of potential claims. *California Union*, 914 F.2d at 1277–78.

Finally we come to the FDIC's cross-appeal, No. 90–2445NI. It urges that we revisit the District Court's holdings that the regulatory exclusion was neither ambiguous nor against public policy. We decline the invitation. We see no error of law or fact in the District Court's analysis and conclusions on these points. They are in line with the vast majority of courts which have considered this exclusion. No good

purpose would be served by repeating those discussions. Accordingly, we affirm this part of the District Court's decision.

\* \* \* \* \* \*

The judgment of the District Court for all of the defendants except Jack Christensen is reversed, and the cause remanded with directions to enter judgment in favor of American Casualty. The judgment against Jack Christensen is affirmed. Costs in this Court are awarded in favor of American Casualty in both appeals.

It is so ordered.