C & H FARM SERVICE CO. OF
IOWA; and FS Credit Corp.,
Appellants,

v.

FARMERS SAVINGS BANK, Frederika,
Iowa; and Tripoli AG Center,
Appellees,

and

Wayne's AG Center; Kenneth Wedemeier; and Vern Wedemeier, Defendants.

No. 88–1299.

Supreme Court of Iowa.

Dec. 20, 1989.

Rehearing Denied Jan. 22, 1990.

William D. Werger and Lori L. Koop of Morain, Burlingame, Pugh, Juhl & Peyton, West Des Moines, for appellants.

Frances L. Gohlke of Carney & Gohlke, Waverly, for appellee Farmers Sav. Bank.

James L. Wagner of Gartelos & Wagner, Waterloo, for appellee Tripoli Ag Center.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

This matter arises out of plaintiffs' suit for defendants' alleged conversion of collateral and proceeds of collateral in which plaintiffs held a security interest. The suit was tried at law to the district court against two of the defendants, Tripoli Ag Center and Farmers Savings Bank of Frederika. The court denied plaintiffs any recovery from either of these defendants, and plaintiffs appealed. We affirm in part, reverse in part, and remand the matter for the limited purpose of determining, on this record, the amount of money, if any, due plaintiffs from Tripoli Ag Center and Farmers Savings Bank.

I. *Background facts and proceedings.* Duane and Nina Schellhorn (Schellhorns) were engaged in farming on land near Frederika, Iowa. Between 1979 and 1984, Schellhorns purchased farm supplies from the local cooperative, C & H Farm Service Company of Iowa. Some of the purchases were financed through FS Credit Corporation, an agricultural lender affiliated with C & H. To secure at least some of their debts to C & H and FS Credit (hereinafter referred to collectively as C & H), Schellhorns twice granted C & H a security interest in crops growing or to be grown on the land they farmed. In 1982 and 1984, Schellhorns attempted to grant a security interest in the same collateral to Farmers Savings Bank (the bank).

Between 1980 and 1985, Tripoli Ag Center (Tripoli), Wayne's Ag Center, and Kenneth and Vern Wedemeier bought grain from Schellhorns. The grain so purchased was allegedly collateral for Schellhorns' debts to C & H. Schellhorns deposited the proceeds of these grain sales to their checking account at the bank and did not always pay the proceeds to C & H.

In June 1984, C & H obtained judgments against Schellhorns for over $84,000. The judgments were not satisfied. In April 1985, C & H brought this action against the bank, Tripoli, Wayne's Ag Center and the

Wedemeiers. Prior to trial, the Wedemeiers took bankruptcy and the action was stayed as to them. In addition, C & H obtained summary judgment against Wayne's Ag Center for conversion of collateral. The action proceeded to trial against the bank and Tripoli.

In finding for the bank against C & H, the district court assumed that C & H held a first priority security interest in at least some of the grain proceeds Schellhorns deposited to their checking account. The court found that "at all material times," the account was overdrawn. The court reasoned that because the account was overdrawn, any deposited proceeds of C & H's collateral were no longer identifiable in Schellhorns' account; thus, C & H's security interest in the proceeds was lost. *See* Iowa Code § 554.9306(2) (1981) (security interest in collateral continues in *identifiable* proceeds of collateral). In addition, the court refused to characterize the bank's payment of Schellhorns' overdrafts as unsecured loans, and the bank's application of deposited proceeds to reduce the account's overdrawn (debit) balance as a set-off. The result of the court's reasoning was to deny C & H any recovery from the bank.

In denying C & H recovery against Tripoli, the district court held that C & H had failed to prove that it held an effective, first priority security interest in any grain Tripoli had purchased from Schellhorns at the time the purchases were made. The linchpin of the analysis was the court's ruling that C & H, through its prior course of dealing with Schellhorns, had waived any security interest it may have had in Schellhorns' 1983 grain purchased by Tripoli until October 1984. As for other crop years, the court found that C & H had failed to establish its first priority.

On appeal, C & H alleges errors and makes arguments too numerous and interdependent to be usefully summarized here. We will attempt to resolve the dispute in an orderly fashion, stating the parties' contentions and additional facts as necessary.

This case was tried to the court as a law action. Our review, therefore, is for correction of errors of law. Iowa R.App.P. 4. The district court's findings of fact have the weight of a special verdict and are binding on appeal if supported by substantial evidence. Iowa R.App.P. 4, 14(f)(1).

II. *The conflicting claims of priority in Schellhorns' crops and crop proceeds.* This case turns on application of Article 9 of the Uniform Commercial Code to transactions between the various parties. *See* Iowa Code chapter 554, article 9 (Uniform Commercial Code—Article 9). As in all cases turning on the law of secured transactions, our first step must be to determine the secured or unsecured status and the relative priority of the parties claiming rights in the collateral at issue. In this case, the collateral is crops grown on certain land near Frederika.[1]

In Iowa, the rules governing attachment and perfection of security interests are statutory. Security interests in crops growing or to be grown are subject to some special rules. Iowa Code section 554.9203 provides, in relevant part:

> 1. . . . *[A] security interest* is not enforceable against the debtor or third parties with respect to the collateral and *does not attach unless*
>
> *a.* the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed *a security agreement* which *contains* a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, *a description of the land concerned;* and
>
> *b.* value has been given; and
>
> *c.* the debtor has rights in the collateral.
>
> 2. A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attach-

---

1. There is no dispute that all of the security agreements and financing statements involved in this case attempted to create or perfect a security interest in growing crops and crop proceeds from the same parcels of land. In addition, there is no contention that land descriptions, where present at all, did not describe the particular land Schellhorns farmed.

ment occurs as soon as all of the events specified in subsection 1 have taken place unless explicit agreement postpones the time of attaching.

3. Unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by section 554.9306.

(Emphasis added.) A security interest in crops growing or to be grown is not perfected until it has attached and a financing statement has been properly filed. *See* Iowa Code § 554.9303(1). In addition to the ordinary formal requisites of a financing statement, a financing statement for crops growing or to be grown must also "contain a description of the real estate concerned." Iowa Code § 554.9402(1). "[A]ny description of ... real estate is sufficient whether or not it is specific if it reasonably identifies what is described." Iowa Code § 554.9110.

The first alleged security interest in crops growing or to be grown on the land Schellhorns farmed arose in 1980. In that year, C & H filed a financing statement pertaining to Shellhorns' crops with the Iowa secretary of state. The financing statement reasonably identified the real estate concerned and was signed by Schellhorns. No signed security agreement relating to this financing statement was produced at trial. In any event, the district court found that the debt relating to this financing statement was fully satisfied prior to 1982. We understand this to be a finding that C & H's 1980 financing statement was terminated prior to 1982. *See* Iowa Code § 554.9404(1). This finding is supported by substantial evidence in the record and, therefore, is binding on appeal.

■ On September 27, 1982, the bank filed a financing statement pertaining to crops growing or to be grown on the land. The financing statement reasonably identified the real estate concerned and was signed by Schellhorns. On its face, this financing statement purported to perfect a security interest created by a security agreement of May 15, 1982. No signed security agreement of that date was produced at trial. Rather, the bank argues

only that this financing statement perfected a security interest which was granted to it in a series of promissory notes/security agreements signed by the Schellhorns between December 1981 and October 1983. The record shows, however, that not even one of these security agreements described the land upon which Schellhorns' crops were growing or were to be grown. In fact, none of these security agreements described any land whatsoever.

The district court apparently found that a security interest was granted by these security agreements and perfected by the bank's September 1982 financing statement. This was error as a matter of law. The security agreements did not contain a description of the land upon which the crops were growing or were to be grown. Thus, the security interest allegedly created by the security agreements never attached and could not be perfected by filing a financing statement. *See* Iowa Code §§ 554.9203, 554.9303; *In the Matter of Permian Anchor Serv., Inc.*, 649 F.2d 763, 765–66 (10th Cir.1981) (under New Mexico U.C.C., where security agreement did not describe collateral, no security interest attached and it could not be perfected by financing statement that did describe collateral). Moreover, the September 1982 financing statement is insufficient to stand by itself as a security agreement because it contains no grant of a security interest. *See Kaiser Alum. & Chem. Sales, Inc. v. Hurst*, 176 N.W.2d 166, 167 (Iowa 1970) (financing statement may double as security agreement if it contains language which grants a security interest and satisfies the other requirements of a valid security agreement). Because there was no adequate, signed security agreement relating to the September 1982 financing statement, that financing statement did not perfect the bank's alleged security interest in crops growing or to be grown on the land. *See In re Sabelka*, 57 B.R. 972, 973–74 (N.D. Iowa 1986) (under Iowa law, description of real estate in financing statement does not satisfy requirement that real estate be described in security agreement in order to

grant security interest in crops growing or to be grown).[2]

On November 17, 1982, Schellhorns granted C & H a security interest in all crops growing or to be grown on the land. The security agreement was signed by Schellhorns and described the land that Schellhorns farmed. On November 29, C & H filed a financing statement which conformed to the statutory requirements for perfecting a security interest in crops growing or to be grown. From that date forward, C & H held a perfected security interest in the collateral described in its security agreement and financing statement of November 1982. We note that the language of this security agreement does not limit the security interest to 1983 crops.

In February 1983, C & H and the bank entered into a written agreement whereby the bank subordinated its security interest in "1983 crops," as "evidenced" by its September 1982 financing statement, to C & H. We have already determined that in February 1983 the bank held no attached or perfected security interest in Schellhorns' crops, in any event.

■ On May 18, 1984, the bank filed a financing statement purporting to perfect a security interest, created by a security agreement of May 17, 1984, in crops raised on the land in 1984, 1985 and 1986. The financing statement was signed by Schellhorns and reasonably identified the land which Schellhorns farmed. No signed security agreement of May 17, 1984, was produced at trial. The district court apparently did not consider what effect, if any,

this financing statement had on the rights of the parties to crops grown on the land in 1984 or thereafter. The bank does not argue the effect of this document on appeal. We, therefore, express no opinion on the effect of the bank's May 1984 financing statement on the rights of the parties. The district court should consider this issue on remand.

In sum, from November 1982 to at least May 1984, the only perfected security interest in crops grown on the land was C & H's November 1982 security interest. The district court erred as a matter of law in giving effect to the bank's alleged September 1982 security interest. We express no opinion on the effect of the bank's May 1984 financing statement. On remand, the parties' rights must be determined accordingly.

III. *Tripoli's liability for conversion of C & H's collateral.* C & H's petition alleged that Tripoli purchased grain from Schellhorns in which C & H held a security interest. Because Tripoli did not protect that security interest, C & H argues that Tripoli is liable for conversion of the collateral.

The district court found that C & H held a perfected, first priority security interest in grain grown by Schellhorns in 1983, through the bank's subordination agreement if not otherwise. The court ruled, however, that this security interest was waived by C & H through its prior course of dealing with Schellhorns and was not effective at the time Tripoli purchased 1983 grain from Schellhorns. Therefore, the

**2.** We recognize that the Uniform Commercial Code is to be liberally construed to promote commerce. *See* Iowa Code § 554.1102. From this premise, the bank argues that the land description in the September 1982 financing statement satisfied the statutory requirement that the land be described in the underlying security agreements. We deem it unwise, however, to approve inattention to the plain mandate of the code by giving effect to a security agreement which does not describe the land upon which the crop collateral is growing or to be grown. The description of the land in the financing statement does not excuse the bank's utter failure to describe the land in the security agreements. To hold otherwise would promote great uncertainty as to what is required to create and

perfect a security interest in growing crops in Iowa. The Uniform Commercial Code was intended to eliminate uncertainty about such matters. Therefore, we think the objectives of the U.C.C. are best served by strict application of the plain mandate of section 554.9203 that a security interest in growing crops be granted in a signed security agreement *in which the crop land is described. Cf. In the Matter of the Estate of Voelker*, 252 N.W.2d 400 (Iowa 1977) (failure to describe land in financing statement resulted in loss of priority in crop collateral grown on the land because security agreement could not be perfected by financing statement not describing the land, under Iowa Code section 554.-9402).

court held that Tripoli was not liable to C & H for conversion of the 1983 grain. The court also held that as to other grain purchased by Tripoli from Schellhorns, C & H had failed to prove first priority of its security interest. The court ruled that the bank had first priority in the 1984 grain, apparently by virtue of its alleged September 1982 security interest. We have already determined that the bank's alleged September 1982 security interest was not effective because it did not attach.

Iowa Code section 554.9306(2) provides, in relevant part:

> Except where this Article otherwise provides, a security interest continues in collateral notwithstanding ... disposition thereof unless the disposition was authorized by the secured party in the security agreement *or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor.

(Emphasis added.) Beginning with our decision in *Lisbon Bank and Trust Company v. Murray,* 206 N.W.2d 96 (Iowa 1973), we have recognized that the "or otherwise" language in this section includes authorization implied from a prior course of dealing between the secured party and the debtor.

■ Several principles have emerged from the line of cases beginning with *Lisbon Bank.* For example, the fact that a written security agreement prohibits sale of collateral without the prior written consent of the secured party will not preclude the secured party from being held to have impliedly authorized sale of collateral without its consent. *Hedrick Savings Bank v. Myers,* 229 N.W.2d 252, 255–56 (Iowa 1975). An implied authorization to sell collateral in such cases is not affected by failure of the debtor to live up to a condition that it account to the secured party for the proceeds. *Lisbon Bank,* 206 N.W.2d at 99. The same failure does not affect the rights of a purchaser of collateral who neither participates in the condition nor has knowledge thereof. *First State Bank v. Shirley Ag Serv., Inc.,* 417 N.W.2d 448, 453 (Iowa 1987). The mere fact that the purchaser had knowledge of the security interest—as opposed to knowledge of a restriction on the debtor's right to sell the collateral—also does not alter the result. *Lisbon Bank,* 206 N.W.2d at 99. In sum, when a third party purchases collateral from a debtor under the course of dealing waiver doctrine, the third party takes the collateral free of the secured party's security interest.

■ One limit of the course of dealing waiver doctrine is that a secured party's rights under a security agreement, though waived by a prior course of dealing, may be reasserted by giving reasonable notice to the debtor that the creditor intends to do so. *FS Credit Corp. v. Troy Elevator, Inc.,* 397 N.W.2d 735, 737–38 (Iowa 1986) (*Troy Elevator I*). The terms of a new security agreement between the parties, for example, may serve to withdraw a course of dealing waiver of similar terms under an old security agreement. *Id.* Nevertheless, the reasserted rights may again be waived by course of dealing subsequent to their reassertion. *Id.* at 738–39; *see also FS Credit Corp. v. Troy Elevator, Inc.,* 421 N.W.2d 537 (Iowa 1988) (*Troy Elevator II*) (affirming judgment that course of dealing waiver effected prior to secured creditor's reassertion of rights continued after reassertion).

■ With these principles in mind, we turn to the course of dealing between C & H and Schellhorns. The security agreement relating to C & H's 1980 financing statement apparently provided that Schellhorns were not to sell collateral without the prior written consent of C & H. In addition, on November 8, 1982, C & H sent a letter to Schellhorns in which C & H's credit manager reminded Schellhorns of C & H's security interest in Schellhorns' 1982 crop and requested that Schellhorns "Please contact us when you desire to sell your grain, or instruct your buyer to include our name on his draft."

The district court found that before November 1982, C & H did not enforce the prior written consent provision of its security agreement against Schellhorns or, for that matter, against any of the approximately thirty farmers who had a similar arrangement with C & H. The actual prac-

tice of C & H was to allow the farmers, including Schellhorns, to sell collateral without its prior written consent. Most of the time, the farmers used the proceeds of C & H's collateral to pay C & H, in any event. The important point, however, is that the court found that C & H had knowledge of, and acquiesced in, a course of dealing between itself and Schellhorns contrary to the terms of the security agreement between them.

Like the 1980 security agreement between C & H and Schellhorns, the November 1982 security agreement provided that:

EXCEPT AS PROVIDED HEREIN, PATRON MAY NOT SELL OR OTHERWISE DISPOSE OF THE COLLATERAL OR ANY PORTION THEREOF WITHOUT THE PRIOR WRITTEN CONSENT OF COMPANY. Any waiver by Company of this paragraph or failure to require prior written consent shall in no way operate as a waiver of Patron's obligations hereunder for any future sale, transaction, or event.

The district court recognized that C & H could reassert its rights by informing Schellhorns of its intention to do so or, as to Tripoli, by informing Tripoli of the conditions attached to Schellhorns' authorization to sell collateral. The district court also recognized that the letter of November 8 and the terms of the November 1982 security agreement informed Schellhorns of C & H's apparent intention to reassert its right to prior written consent before sale of collateral, notwithstanding its past waiver of that right through course of dealing. *See Troy Elevator I*, 397 N.W.2d at 737–38. Nevertheless, the court found that C & H's waiver of its security interest through a prior course of dealing continued after November 1982. The court found that the prior course of dealing—under which C & H did not require Schellhorns to obtain its prior written consent before selling collateral despite the terms of the security agreement between them—was followed until October 5, 1984. Thus, the court denied C & H recovery from Tripoli for conversion of any collateral Tripoli purchased from Schellhorns prior to that date. The court also denied C & H recovery from

Tripoli for the value of grain purchased from Schellhorns after October 5, finding that those purchases involved grain in which the bank had first priority by virtue of its alleged September 1982 security interest.

C & H assails the district court's finding of post–November 1982 course of dealing waiver on several grounds. First, C & H argues that the court erred in failing to consider both the language of the November 8 letter and the language of the November 1982 security agreement in its analysis of the waiver/reassertion issue. C & H asserts that the court considered only the former document. The record does not support this argument. The court considered both documents.

C & H next asserts that the district court erroneously believed that the condition imposed by the security agreements (in effect, "Schellhorns may sell collateral only with the prior written consent of C & H") was somehow different from the instruction in the November 8 letter (in effect, "Schellhorns may sell collateral only if C & H expressly consents or is made copayee of the proceeds check, so that Schellhorns may negotiate the check only with the endorsement of C & H").

Assuming this assertion to be true, it does not require reversal of the court's finding of continued waiver. We can agree with C & H that these "conditions" on Schellhorns' authorization to sell collateral were not materially different. The district court simply found that C & H took no care to enforce its right to veto the sale of collateral at any time prior to October 5, 1984, whatever the form of the veto power. Neither Schellhorns' failure to obtain prior written consent of C & H to sell collateral nor their failure to live up to an agreement to instruct Tripoli to make C & H copayee on the collateral proceeds checks affects the validity of the waiver as to collateral in the hands of Tripoli, so long as Tripoli was ignorant of the agreement. *See Shirley Ag*, 417 N.W.2d at 453.

Third, C & H argues that there is no substantial evidence to support the district

court's finding of continued waiver. The argument is two-pronged. We answer each in turn.

C & H contends that the court erred in considering the course of dealing that existed between C & H and Schellhorns *prior* to the November 1982 reassertion in determining whether C & H had waived its security interest *after* the reassertion. According to C & H, the pre–November 1982 course of dealing may not be considered in evaluating the significance of the post–November 1982 course of dealing.

In *Troy Elevator I*, 397 N.W.2d at 739, we stated that although evidence of the course of dealing prior to a secured party's reassertion of its right to prior written consent would not, by itself, establish a continued waiver after the reassertion, that evidence could properly be considered by the court in determining whether the waiver effected before the reassertion had continued afterward. *See also Troy Elevator II*, 421 N.W.2d at 538–39. That is precisely what the court did in this case. We find no error in this regard.

C & H also contends that there is no evidence that it was aware of any sales of collateral by Schellhorns without its prior written consent. According to C & H, this distinguishes its case from the prior cases of this court involving course of dealing waiver under section 554.9306(2). C & H reads those cases as involving secured parties that admitted to knowing of specific instances in which they had allowed their debtor to sell collateral without the prior written consent called for in the security agreement. C & H argues that while its general business practice may have been to allow its debtors to sell collateral without its prior written consent, there is no evidence that it knew that Schellhorns ever did the same.

■ We can, for the sake of argument, agree with the proposition that a secured party must have actual knowledge of its debtor's sales of collateral without prior written consent before the secured party may be deemed to have waived its right to such consent by course of dealing. The district court noted that *"Mr. Neilsen* [C &

H's general manager from 1980 to 1986] *specifically admitted that the Schellhorns were not required to get written consent or have joint checks issued prior to the fall of 1984."* (Emphasis added.) There is substantial record evidence in addition to this admission to support a finding that C & H knew that Schellhorns were selling collateral in a manner contrary to the terms of the November 1982 security agreement.

■ Finally, C & H argues that two transactions between Tripoli and Schellhorns were outside any course of dealing acquiesced in by C & H and, therefore, Tripoli should be liable for conversion of collateral in the two transactions. The two transactions involved Schellhorns delivering grain to Tripoli in exchange for some cash and cancellation of an antecedent debt owed Tripoli. The parties apparently agree that except for these two transactions, Schellhorns always sold their grain for cash alone. C & H argues that Tripoli should be liable for conversion of collateral it purchased in these two transactions to the extent that it paid for collateral by cancelling an antecedent debt and not with cash.

We reject this argument. The course of dealing between C & H and Schellhorns was that Schellhorns sold collateral without C & H's prior written consent and applied the proceeds to whatever purpose they saw fit. Payment of a debt to a grain elevator is not outside this course of dealing.

More importantly, we think that the result of a conversion action against a third party that purchased collateral from a debtor under the course of dealing waiver doctrine should not differ merely because the consideration paid the debtor in exchange for the collateral was cancellation of a debt, instead of cash. Where a third party purchases collateral from a debtor under this doctrine—whatever the consideration for the purchase—the third party is not liable to the secured party for conversion of the collateral. The secured party has waived its security interest in collateral

in the hands of third party purchasers.[3] The secured party may still pursue its debtor and the proceeds of collateral in the hands of the debtor. *See, e.g., Humboldt Trust & Savings Bank v. Entler,* 349 N.W.2d 778, 782–83 (Iowa App.1984) (although third party that purchased collateral from debtor under course of dealing waiver doctrine was not liable for conversion of collateral, proceeds of collateral still in the hands of the debtor were nonetheless subject to secured party's lien).

The rationale of allowing a third party to take the collateral free of the security interest under the course of dealing waiver doctrine is that when the security interest is waived by the secured party, the personal obligation of the debtor is substituted for the collateral. *Shirley Ag,* 417 N.W.2d at 453. This rationale is equally present when the collateral is sold for cancellation of a debt or for cash. As between C & H, which slept on its rights, and Tripoli, which dealt innocently with Schellhorns, it is C & H that must bear the cost of Schellhorns' defalcation.

■ The record does show, however, that Tripoli bought grain from Schellhorns at least twice following the October 1984 reassertion of C & H's rights as holder of the November 1982 security interest. Tripoli may be liable for conversion of that grain, depending on the relative priority of the parties' rights to the grain.

In sum, Tripoli is not liable to C & H for conversion of collateral it purchased from Schellhorns during the continuance of C & H's waiver of the November 1982 security interest. Substantial evidence supports the district court's finding that, as to Tripoli, the waiver continued until October 5, 1984. Tripoli may be liable to C & H for conversion of grain it purchased from Schellhorns after that date, if the grain was C & H's

collateral. On remand, the district court should reconsider this issue in light of our opinion and enter judgment between C & H and Tripoli accordingly.

■ IV. *The bank's liability for conversion of proceeds of C & H's collateral.* C & H's petition alleged that the bank had converted proceeds of collateral in which C & H had a security interest. As noted previously, Iowa Code section 554.9306(2) provides, in relevant part:

[A] security interest continues in collateral notwithstanding ... disposition thereof unless the disposition was authorized by the secured party ... *and also continues in any identifiable proceeds including collections received by the debtor.*

(Emphasis added.) Checks received by Schellhorns in exchange for collateral are "cash proceeds" of the collateral within the meaning of this section. Iowa Code § 554.9306(1).

The district court assumed, for the sake of this argument, that C & H had first priority in certain cash proceeds deposited to Schellhorns' checking account and had not waived its security interest in the proceeds along with the security interest in the collateral. The court reasoned, however, that because Schellhorns' checking account was overdrawn "at all material times," any proceeds that had been deposited to the account were no longer identifiable. The court concluded that the bank was not liable to C & H for conversion because the bank did not hold any identifiable proceeds of C & H's collateral.

In order to decide whether, under section 554.9306(2), the bank holds identifiable proceeds of C & H's collateral, we must first determine whether C & H had an effective security interest in the alleged collateral. If it did, then we must determine whether

---

**3.** We thus decline to follow *Larsen v. Warrington,* 348 N.W.2d 637 (Iowa App.1984). In *Larsen,* the course of dealing was that the debtor sold collateral to third parties for cash without the prior written consent of the secured party required by the security agreement, but applied the cash proceeds to the debts owed the secured party and to other debts. *Id.* at 639. In the challenged transaction the debtor traded collateral to the plaintiff in exchange for cancellation of an antecedent debt. *Id.* The court of appeals held that the challenged transaction was outside the course of dealing between the debtor and the secured party, so that the secured party's security interest in the collateral retained its priority over the rights of the plaintiff in the collateral. *Id.* at 642.

the proceeds of the collateral are identifiable in the hands of the bank. *See* Iowa Code § 554.9306(2).

We have already affirmed the district court's ruling that until October 5, 1984, C & H waived its security interest in collateral in the hands of Tripoli by its prior course of dealing with Schellhorns. We think that ordinarily, where a secured party waives its security interest in collateral under the course of dealing waiver doctrine, the derivative security interest in proceeds of the collateral should be deemed waived to the same extent.

At least since February 1983, the bank knew of the existence of C & H's claimed security interest in Schellhorns' 1983 grain. The bank apparently did not know of the conditions attached to Schellhorns' authorization to sell their grain. Ordinarily, during the pendency of the course of dealing waiver of C & H's security interest, the bank would take the proceeds of C & H's collateral free of the security interest. In this case, however, *the bank expressly subordinated its rights to Schellhorns' 1983 grain to the rights of C & H*. Whatever the status of the underlying security interests, C & H and the bank clearly intended that C & H's rights to that grain would be superior between them. Under these circumstances, the bank cannot assert the course of dealing waiver doctrine as a means of escaping the clear intent of the voluntary subordination of its rights in the 1983 grain to those of C & H.

We conclude that as between C & H and the bank, C & H had priority in Schellhorns' 1983 grain by virtue of the bank's subordination agreement, notwithstanding the course of dealing waiver by C & H of its November 1982 security interest. The subordination agreement, however, applies only to 1983 grain. On remand, the court must determine the effect and duration of C & H's course of dealing waiver with regard to proceeds of any grain, other than 1983 grain, in which C & H may have held a security interest.

Having determined that C & H's course of dealing waiver does not preclude its tracing identifiable proceeds of 1983 grain, at least, into the hands of the bank, we must next determine whether the bank holds any identifiable proceeds of Schellhorns' grain. The record conclusively shows that many checks deposited to Schellhorns' checking account came from grain sales to various buyers of Schellhorns' 1983 grain. Other checks deposited to Schellhorns' account were proceeds of other grain. When deposited, the checks were clearly identifiable cash proceeds of Schellhorns' grain.

From 1980 through 1984, Schellhorns' checking account at the bank was often overdrawn, that is, it had a debit balance. The bank would routinely pay Schellhorns' overdrafts out of its own funds, then recover the amounts so advanced to Schellhorns from the grain proceeds subsequently deposited to Schellhorns' account. Sometimes a deposit would result in the previously overdrawn checking account carrying a positive, or credit, balance; sometimes the account remained overdrawn despite the deposit. In any event, the account would soon be overdrawn again. By the time C & H notified the bank of its intention to claim the funds in the account as identifiable proceeds of collateral, the account was overdrawn. There was also evidence that from time to time, the bank would apply some of the grain proceeds to other debts Schellhorns owed from promissory notes to the bank.

The district court reasoned that because Schellhorns' checking account was overdrawn "at all material times," there were no identifiable proceeds remaining in the hands of the bank. Thus, the court concluded that the bank was not liable for conversion.

In reaching its conclusion, the district court analogized this case to one in which a bank accepts identifiable cash proceeds of collateral for deposit to a customer's checking account and then pays the entire account balance out to other creditors of the customer who present the customer's checks for payment. The court stated that in such a case, the bank is not liable for conversion of the proceeds. C & H chal-

lenges the court's analogy but not its statement of the law.

Assuming that the court correctly stated the law, we agree with C & H that the analogy drawn by the court is faulty as to some of the transactions involved here. In the case of Schellhorns' overdrafts, the bank did not pay the checks from identifiable cash proceeds deposited to its customer's account. Rather, various creditors of the customer presented checks to the bank for payment from an account which had an overdrawn, or debit balance. *The bank paid these checks out of its own funds.* In effect, the bank loaned Schellhorns enough money to cover the amount of the overdrafts. When the bank accepted the identifiable cash proceeds of the grain for deposit and applied those proceeds to reduce the debit balance of Schellhorns' account, it was simply satisfying Schellhorns' antecedent debt to it with proceeds in which C & H had a security interest. In the analogy accepted by the district court, the bank paid checks to other creditors of its customer with proceeds in which a secured party had a security interest; in the case at bar, the bank paid checks to other creditors of its customer with its own funds and then paid itself with proceeds in which a secured party, C & H, had a security interest.

When the bank paid Schellhorns' checks regardless of the fact that there were no funds in Schellhorns' account, the bank became a creditor of Schellhorns and accepted the risk of an unsecured loan to them. *See, e.g., State v. Mullin,* 225 N.W.2d 305, 308 (Iowa 1975) (bank's payment of overdraft is extension of credit to customer); *Thiele v. Security State Bank of New Salem,* 396 N.W.2d 295, 298 (N.D.1986) (bank's payment of overdraft is unsecured loan to customer). The character of the bank's right to identifiable cash proceeds of C & H's collateral deposited to Schellhorns' checking account thus becomes apparent. It is a common setoff situation, whereby the bank attempted to recover Schellhorns' debt to it (from the payment of overdrafts) by offsetting that debt against its own debt to Schellhorns (from the deposit of grain proceeds).

Under our law the bank is not entitled to such a setoff prior to insolvency proceedings involving Schellhorns. *See* Iowa Code § 554.9306(4); *Coachmen Industries, Inc. v. Security Trust & Savings Bank of Shenandoah,* 329 N.W.2d 648, 650 (Iowa 1983). The record reveals no insolvency proceedings instituted by or against Schellhorns. C & H's security interest in the proceeds of its collateral, therefore, takes priority over the bank's attempted setoff. *Id.* To the extent that the bank applied deposited proceeds of C & H's collateral to reduce the debit balance of Schellhorns' account, the bank is liable to C & H for conversion.

The bank defends the result reached by the district court by citing cases following the language of Official Comment 2(c) to Uniform Commercial Code section 9–306. That section is identical to Iowa Code section 554.9306. The cited comment states:

Where cash proceeds are covered into the debtor's checking account and paid out in the operation of the debtor's business, recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in the ordinary course.

The bank argues that because it routinely paid Schellhorns' overdrafts, its setoff of the deposited proceeds against the debit balance of Schellhorns' account was "in the ordinary course." The bank asserts, therefore, that it takes the proceeds free of C & H's security interest. Believing, as we do, that the bank's payment of Schellhorns' overdrafts constituted unsecured loans from the bank to Schellhorns, we cannot agree.

We recently rejected the bank's argument, on slightly different facts, in *Linn Cooperative Oil Company v. Norwest Bank Marion, N.A.,* 444 N.W.2d 497 (Iowa 1989). Our conclusion here, as there, is that a secured party's right to proceeds of collateral deposited to the debtor's bank account is superior to the bank's right to a setoff of the same proceeds against amounts the debtor owes the bank. In

other words, the bank may not loan money to Schellhorns by paying Schellhorns' overdrafts and then expect to "jump over" C & H's priority in identifiable proceeds of C & H's collateral. The bank is liable for conversion of C & H's collateral to that extent.

The district court also concluded that any proceeds that had been deposited to Schellhorns' account were unidentifiable because of the ending overdrawn (debit) balance of the account. This conclusion stems from the implication of our language in *Coachmen Industries*, 329 N.W.2d 648. In that case, the debtor sold collateral and deposited the proceeds to its checking account at the defendant bank, which held a security interest in the collateral. *Id.* at 649. The plaintiff held a purchase money security interest in the same collateral. *Id.* Before the debtor's check to the plaintiff had cleared, the bank offset the balance of the debtor's account against the amount the debtor owed it. *Id.* The plaintiff sued the bank to recover the proceeds of its collateral. Finding the plaintiff's security interest superior to both the bank's security interest and its common law right of setoff, we affirmed a judgment for the plaintiff, saying:

> The fact that the proceeds were commingled with other funds of the debtor does not defeat this priority by making them unidentifiable. *The proceeds are identifiable in their entirety within the meaning of the statute because the account balance always exceeded the amount of the proceeds during the period involved.*

*Id.* at 650 (emphasis added) (citing *Michigan Nat'l Bank v. Flowers Mobile Home Sales, Inc.*, 26 N.C.App. 690, 217 S.E.2d 108 (1975)).

Both *Coachmen Industries* and the *Flowers* case are consistent with what is known as the "lowest intermediate balance rule" for tracing proceeds in a commingled fund account. Under this rule, a secured creditor is entitled to the full amount of the proceeds of its collateral deposited to a commingled fund account if the balance of the account remains at all times equal to or greater than that amount; but if the account balance is at any time reduced below the amount of the deposited proceeds, the creditor cannot recover more than the lowest balance in the account even though deposits thereafter increase the balance of the account. *See, e.g., Ex Parte Alabama Mobile Homes, Inc.*, 468 So.2d 156, 160 (Ala.1985).

From this principle the district court reasoned that because the checking account was overdrawn by the time C & H claimed the balance as proceeds of collateral, any proceeds that had been deposited to the account were not identifiable. The bank agrees, of course, and argues that it cannot be liable to C & H for conversion because it holds no identifiable proceeds of C & H's collateral.

To the extent that the bank paid Schellhorns' checks to other creditors at times when Schellhorns' checking account carried a positive, or credit balance, we agree with the bank. The lowest intermediate balance rule alluded to in *Coachmen Industries* would apply. Because the account was overdrawn by the time C & H claimed its balance as proceeds of collateral, all of the proceeds had been paid out and none remained to be identified in the hands of the bank.

To the extent that the bank paid Schellhorns' overdrafts and then paid itself from deposited proceeds of C & H's collateral, however, we cannot agree with the bank. As we said before, the bank may not loan money to Schellhorns by paying overdrafts and then expect to "jump over" C & H's priority in identifiable cash proceeds of C & H's collateral. The proceeds were not made unidentifiable by the bank's setoff; the bank now holds them for its own benefit. To allow the bank's practice of loaning money to Schellhorns by paying overdrafts to displace C & H's priority in 1983 grain, or other grain in which C & H held an effective security interest, would upset the rules of priority established by the Uniform Commercial Code. Absent insolvency proceedings as specified in Iowa Code section 554.9306(4), C & H's right to the proceeds of its collateral is prior to the bank's right

of setoff. *See Coachmen Industries*, 329 N.W.2d at 650.

We conclude that the district court erred as a matter of law in refusing to characterize the bank's payment of Schellhorns' overdrafts as unsecured loans. The court also erred in holding that none of the proceeds of C & H's collateral are identifiable in the hands of the bank. To the extent that the bank loaned money to Schellhorns by paying their overdrafts and then offset proceeds deposited by Schellhorns against those or any other antecedent debts, the proceeds are identifiable in the hands of the bank. The record shows that the bank followed this course more than once with respect to proceeds of 1983 grain which was C & H's collateral, at least. The case against the bank must be reversed and remanded for further consideration and judgment consistent with this opinion.

V. *Summary and disposition.* Tripoli is not liable to C & H for conversion of grain purchased from Schellhorns during the continuance of C & H's course of dealing waiver of its security interest. Tripoli may be liable to C & H for conversion, however, to the extent that it purchased grain from Schellhorns after C & H reasserted its rights in October 1984, if that grain was C & H's collateral. On remand, the district court must determine, on the existing record, whether Tripoli made any such purchases, and enter judgment between C & H and Tripoli accordingly.

The bank is liable to C & H to the extent that it offset any proceeds of 1983 grain, at least, against debts Schellhorns owed it. On remand, the district court must also determine, on the existing record, whether the bank similarly offset proceeds of other grain in which C & H held an effective, superior security interest. The court should enter judgment between C & H and the bank accordingly.

The case is affirmed in part and reversed in part and remanded for further consideration and judgment consistent with this opinion.

Costs on appeal are taxed one-third each to C & H, Tripoli and the bank.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.