Dixie L. **ELLEFSON**, Appellant,

v.

**CENTECH CORPORATION, A Minnesota Corporation d/b/a North Iowa Electronics, Defendant,**

**and Winnebago Industries, Inc., Appellee.**

No. 98–528.

Supreme Court of Iowa.

Feb. 16, 2000.

Randall E. Nielsen of Pappajohn, Shriver, Eide & Nicholas, P.C., Mason City, for appellant.

Scott D. Brown of Brown, Kinsey & Funkhouser, P.L.C., Mason City, for appellee.

Considered by LARSON, P.J., and LAVORATO, SNELL, TERNUS, and CADY, JJ.

LAVORATO, Justice.

The plaintiff, Dixie L. Ellefson, appeals from a district court ruling that authorized a bank-garnishee to release her garnishment of two bank account funds belonging to Centech Corporation. Winnebago, an intervenor in these proceedings, was an assignee of a security agreement that covered the collateral from which the funds were derived. Winnebago was also the assignee of what was purported to be a pledge that allegedly gave the assignor a lien on the funds in the bank accounts. By virtue of the security agreement and purported pledge, Winnebago claimed it had a right to the funds that was superior to Ellefson's garnishment claim. Ellefson contends the district court erred in rejecting her contention that any security interest in the funds was (1) waived or (2) at least limited by Iowa Code section 554.9306(4)(d)(ii) (1995). We disagree and affirm.

## I. Background Facts and Proceedings.

Centech Corporation was a Minnesota corporation doing business in Iowa. Centech, a closely held corporation, engineered and manufactured a wide range of products from pregnancy detectors for pigs to computer equipment.

On February 25, 1994, Republic Acceptance Corporation extended credit to Centech according to the terms of an accounts receivable financing agreement. This indebtedness was secured by a security agreement dated February 25, 1994 (Security Agreement). The Security Agreement granted Republic a security interest in all of Centech's then-existing as well as future accounts, contract rights, other rights to payment, inventory, equipment, general intangibles, and "proceeds of any and all of the foregoing property." Republic perfected its security interest in the collateral by filing financing statements with the Iowa Secretary of State.

Centech purchased assets of North Iowa Electronics from Winnebago Industries, Inc. and thereafter began operating in Garner, Iowa, under the trade name North Iowa Electronics. Republic eventually financed this purchase, and Winnebago guaranteed Centech's debt to Republic.

In 1996, Centech was experiencing severe financial difficulties. These financial difficulties prompted a forbearance agreement in September 1996 (Forbearance Agreement) between Centech and Republic. In this agreement, Centech acknowledged (1) it owed Republic $4,674,628, (2) it was in default, and (3) Republic was entitled to foreclose on the collateral secured by the Security Agreement. Republic agreed to forebear from exercising its rights and remedies under certain conditions to allow Centech to continue its operations while seeking a buyer for its business. One of the conditions prohibited Centech from selling collateral without Republic's prior approval other than in the ordinary course of business.

The Forbearance Agreement was contingent on (1) Centech depositing all of its funds into an account at Clear Lake Bank & Trust in Garner and pledging that account to Republic, (2) Centech executing a repossession and occupancy agreement, and (3) Winnebago loaning Centech $125,-000 for operating expenses.

Pursuant to the Forbearance Agreement, Centech deposited its funds into two bank accounts at the Clear Lake Bank. Centech thereafter executed an assignment of accounts agreement (Assignment of Accounts Agreement) on September 11, 1996. In the Assignment of Accounts Agreement, Centech stated that for value received it assigned, pledged and granted a security interest to Republic in Centech's right, title and interest in the two bank accounts. The Assignment of Accounts Agreement stated it was to secure Centech's debt to Republic under the Security Agreement.

The Assignment of Accounts Agreement prohibited Centech from transferring any monies from the two accounts without prior written consent from Republic. The Agreement expressly provided, however, that this restriction

> shall not be construed ... to restrict [Centech's] right to transfer funds in accordance with the Security Agreement ... or to withdraw any funds from the Operating Account in the ordinary course of business prior to demand being made by [Republic] for payment.

The Agreement also provided that

> [u]nder no circumstances shall the Depository be required to determine whether any conditions of payment or delivery to [Republic] or any restrictions on transfer or withdrawal of funds by [Centech] have been satisfied or whether the funds paid or property delivered in accordance with any ... direction have been properly applied by the Depository....

Additionally, the Assignment of Accounts Agreement provided that (1) the obli-

gations under it were part of the obligations of the Security Agreement and (2) the two bank accounts were part of the collateral mentioned in the Security Agreement.

At the same time that the Assignment of Accounts Agreement was signed, Centech and Republic executed a repossession and occupancy agreement (R. & O. Agreement). Under this last agreement, Centech agreed to deliver to Republic possession of all of the collateral covered by the Security Agreement and the Assignment of Accounts Agreement on October 10, 1996 (Republic later extended this date to January 10, 1997) or upon Centech's earlier default of the Forbearance Agreement.

Republic thereafter notified the Clear Lake Bank & Trust of the assignment of the two bank accounts, and the bank acknowledged acceptance of the terms of the Assignment of Accounts Agreement. Later in September 1996, Winnebago made the $125,000 loan to Centech.

On January 27, 1997, Ellefson obtained a default judgment against Centech for $167,306.25 for claims brought under the federal Americans with Disabilities Act and similar Iowa employment discrimination statutes. Ellefson obtained the judgment in the United States District Court for the Northern District of Iowa. At Republic's direction, Centech made no defense of the action.

Because Centech did not pay its debt to Republic by the due date under the Forbearance Agreement, Republic sold the North Iowa Electronics assets to Midwestern Electronics pursuant to an agreement for the sale of collateral dated January 27, 1997. This sale was done in accordance with the R. & O. Agreement and apparently with Winnebago's consent.

On February 6 Republic assigned to Winnebago all its right, title, and interest in the Security Agreement, the Forbearance Agreement, and the Assignment of Accounts Agreement as well as various financing statements filed with the Iowa Secretary of State, which perfected Republic's security interest. Ellefson does not contend that this assignment to Winnebago was ineffective to transfer all of Republic's interests under these agreements to Winnebago. By the assignment, Republic sold to Winnebago the debt Centech owed to Republic. The assignment released Winnebago from its prior guarantee of Centech's indebtedness to Republic and entitled Winnebago to receive all payments on that indebtedness from Centech.

Meanwhile, on February 18, 1997, Ellefson's default judgment was transferred to the Iowa District Court for Cerro Gordo County, and an execution of judgment issued on March 20, 1997. On March 25 the Cerro Gordo County Sheriff served notice of garnishment on the Clear Lake Bank & Trust. The notice requested garnishment of any and all bank accounts owned by Centech.

In its answers to the garnishment interrogatories, the bank acknowledged it had a total of $123,615.36 in Centech's two accounts. The bank asserted that, before the service of the garnishment notice, Centech had assigned all its right, title, and interest in the two accounts to Republic and that thereafter Republic had assigned all of its right, title, and interest in these accounts to Winnebago. The bank further asserted that Republic and Winnebago "claim a first lien position on both accounts and that the security has been perfected by filings with the Iowa Secretary of State under the provisions of the Iowa Commercial Code."

On May 28 Winnebago filed a petition for intervention, asserting a superior lien to the two bank accounts. More specifically, Winnebago alleged that as assignee of the Security Agreement it acquired a security interest in all of Centech's accounts, inventory, equipment, and general intangibles and that the security interest had been perfected by proper filings with the secretary of state. Winnebago further alleged that, as assignee of the Assignment of Accounts Agreement, it acquired all of

Centech's right, title, and interest in the two bank accounts, and for that reason, it had a prior claim to the funds held by the bank. Winnebago asked the district court to order release of the funds to Winnebago.

In its ruling, the district court stated that Ellefson claimed entitlement to either all, or a portion, of the two bank account funds under two separate theories. First, Winnebago's security interest in the funds was waived by provisions in the Assignment of Accounts Agreement and by expenditures Republic allowed Centech to make from the two bank accounts. Second, Winnebago's security interest in the two bank account funds was limited by Iowa Code section 554.9306(4)(d)(ii) (limiting scope of security interest once insolvency proceedings are instituted) because the sale of Centech's assets constituted "insolvency proceedings."

The district court ruled against Ellefson on both theories. The court concluded that Winnebago's security interest in the two bank accounts was superior to Ellefson's garnishment claim and authorized the bank to release the two bank account funds to Winnebago.

Ellefson appealed. She contends the district court erred in failing to find as a matter of law that the language of the Assignment of Accounts Agreement and the conduct of the parties constituted a waiver of any security interest that Winnebago may claim in the two bank account funds. She also contends that the district court erred as a matter of law in finding that Winnebago's security interest was not limited by Iowa Code section 554.9306(4)(d)(ii).

## II. Scope of Review.

This action arose out of a garnishment proceeding, which "is merely a species of attachment." *Padzensky v. Kinzenbaw*, 343 N.W.2d 467, 469 (Iowa 1984). Because a garnishment proceeding is an action at law, our review is at law rather than de novo. *Id.* The district

court's findings of fact are binding upon us if those findings are supported by substantial evidence. *Id.* However, we are not bound by the district court's legal conclusions, and we may inquire into whether the district court's ultimate conclusions were materially affected by improper conclusions of law. *Smith v. Bertram*, 603 N.W.2d 568, 570 (Iowa 1999).

To the extent this appeal concerns matters of contract construction, our review is at law. *See Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978). We similarly review a district court's interpretation as a legal issue unless that interpretation depended on extrinsic evidence. *Id.* Therefore, when the meaning of an agreement depends on extrinsic evidence, a question of interpretation is left to the trier of fact unless "the evidence is so clear that no reasonable person would determine the issue in any way but one." Restatement (Second) of Contracts § 212 cmt. e, at 128 (1979); *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999).

Winnebago is the intervenor in these proceedings and claims its rights to the bank account funds are superior to Ellefson's garnishment rights. When an intervenor claims a superior right to garnishment funds, the intervenor has the burden to establish its priority to the funds. *Padzensky*, 343 N.W.2d at 469.

## III. Issues.

### A. Waiver.

1. **The Assignment of Accounts Agreement.** In the district court the focus was on the Assignment of Accounts Agreement. Ellefson contends that the district court erred in failing to find as a matter of law that the language of the Assignment of Accounts Agreement and the conduct of the parties constituted a waiver of a security interest, which Winnebago claims in the two bank account funds.

In support of her contention, Ellefson points out that the Assignment of Accounts Agreement purports to limit expenditures by Centech from the two accounts to expenses that would be allowed under the Security Agreement, in other words, expenses in the ordinary course of business. But, she argues, language in the Assignment of Accounts Agreement belies any restrictions on Centech's ability to withdraw funds from the two accounts.

The language she relies on provides the following. First, the bank was, under no circumstances, required to make any inquiries as to any check or withdrawal of funds that Centech made from these accounts. Second, the bank could assume any check or withdrawal that Centech made from these accounts was an expenditure made in the ordinary course of business unless the bank was notified to the contrary.

In further support of her contention, Ellefson points to (1) testimony from the bank that it understood Centech was allowed the use of these accounts until the bank was notified otherwise, (2) lack of any evidence that any such notification was ever given, and (3) uncontroverted evidence that Centech made large and unusual payments without prior approval from, or objection by, Republic.

As garnishor, Ellefson insists that under the law she stands in the shoes of Centech so that if Centech has a right to demand of the bank funds from the two bank accounts, she has that same right. For this reason, Ellefson concludes the bank, as garnishee, was obligated to honor her garnishment.

The district court found that Ellefson failed to prove her waiver claim. Whether the district court was correct turns on our determination of the status of the Assignment of Accounts Agreement under the Iowa Uniform Commercial Code [hereinafter UCC] and the legal nature of the Agreement.

**a. Status of the Assignment of Accounts Agreement under the UCC.** In the Assignment of Accounts Agreement, Centech states that it "assigns, pledges and grants a security interest" to Republic in Centech's right, title, and interest "in two bank accounts." In response to Ellefson's waiver argument, Winnebago contends this language constituted a "completed pledge" of the two accounts to Republic and established a lien in favor of itself as assignee of the Assignment of Accounts Agreement. Winnebago further contends its lien was superior to Ellefson's garnishment claim.

Assuming for the moment that what we have here is a pledge, we must first decide whether one can even establish under the UCC a security interest, that is, a lien in bank accounts. The pertinent provision on this question is found in Article 9 (secured transactions) of the UCC, more specifically, Iowa Code section 554.9104(*l*): "This Article does not apply: ... *l.* to a transfer of an interest in any *deposit account* (section 554.9105, subsection 1).…" (Emphasis added.) Iowa Code section 554.9105(1)(e) pertinently defines a deposit account to mean "a demand, time, savings, passbook or like account with a bank.…"

■ In line with the majority rule, this court has held that the quoted language in section 554.9104(*l*) prohibits the use of bank accounts, such as a checking account, as original collateral under the UCC. *Domain Indus., Inc. v. First Sec. Bank & Trust Co.*, 230 N.W.2d 165, 167 (Iowa 1975); *see also* Ronald A. Anderson, 8A *Uniform Commercial Code* § 9–104:49, at 439 (rev. ed.1996) [hereinafter Anderson] ("The Code does not apply to transfers of bank deposits and savings accounts, or the pledge of bank accounts as original collateral."). Therefore, under the UCC a creditor cannot create an original security interest in a debtor's bank account.

This, however, does not prohibit a creditor from creating a lien in bank accounts at common law. Authority for this proposition is found in Iowa Code section 554.1103, which provides:

Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

*See also* Iowa Code Ann. § 554.1103 cmt. 3 (West 1995) ("The listing given in this section is merely illustrative; no listing could be exhaustive."); *Willow City Farmers Elevator v. Vogel,* 268 N.W.2d 762, 766–67 (N.D.1978) (using statutory provision identical to section 554.1103 to support use of common-law pledge as creating lien on bank accounts); *Duncan Box & Lumber Co. v. Applied Energies, Inc.,* 165 W.Va. 473, 270 S.E.2d 140, 143 (1980) (holding that UCC does not apply to a pledge or transfer of a bank account, and therefore, the validity of such an arrangement is tested, not by the UCC, but under the common law); Anderson, § 9–104:51 ("The [UCC] does not apply to an interest in a deposit account. Consequently a pledge made to the bank by the depositor of the amount on deposit is governed by the common law and not by the [UCC]."); James J. White & Robert S. Summers, *Uniform Commercial Code,* Introduction § 2, at 6 (2d ed.1980) (noting that the UCC "is not a comprehensive codification of commercial law" and recognizing "section 1–103 [of the UCC] [as] probably the most important single provision in the [UCC]").

We conclude that the common law as to pledges is alive and well in Iowa and that pledges can serve as a security device for creditors.

**b. Nature of the Assignment of Accounts Agreement.** We turn to the common law on pledges. A comprehensive discussion of common-law pledges is found in Alphonse M. Squillante, *Pledge As a Security Device,* 87 Com. L.J. 618 (1982), 88 Com. L.J. 7 (1983) [hereinafter Squillante].

The author notes that "[t]wo of the most essential requirements of a pledge at common law was the presence of consideration in the transaction, usually in the form of a debt or some other obligation, and the transference of the property to the possession of the pledgee for that party to hold as collateral to secure the debt." Squillante, 87 Com. L.J. at 620. The author further notes that a "pledge is a security device but it is not a possessory lien, though possession is essential for its enforceability and validity." Squillante, 88 Com. L.J. at 7.

Additionally, at common law,

> [t]he transfer of possession to the pledgee provided the necessary evidence to prove the existence of the contract and, at the same time, gave notice to potential third party creditors that the collateral was in the possession of the pledgee because it was encumbered to secure some debt or obligation due from the pledgor to the pledgee. Without possession the interest of the pledgee would be thought of as no more than a secret lien and as a consequence of that the lien would be unenforceable.

Squillante, 87 Com. L.J. at 621.

Possession in the pledgee is therefore "an essential ingredient" to a pledge. Squillante, 88 Com. L.J. at 79. Such possession "must be absolute, unequivocal, and exclusively" in the pledgee. *Id.* Possession in its simplest form at common law meant the possessor was "free to do with the thing anything which the law permits" and free "to exclude others from doing the same things." *Id.* at 80.

Delivery is an element of possession. *Id.* In its simplest sense, delivery is the "actual, physical, manual, turning over of the pledged personalty to the pledgee or some third party." *Id.* at 160. In addition, when the property is incapable of manual delivery, for example an intangible, there can be a constructive delivery. Constructive delivery means transferring the "means by which [the pledgee] may

obtain possession, control, dominion, or power over the [pledged] collateral." *Id.* at 161. Delivery to an agent of the pledgee is delivery to the pledgee. *Id.* at 162.

■ When a pledge was completed according to these common-law rules, the lien created by the pledge was enforceable against claims of the pledgor's creditors. *Id.* at 81. Conversely, when one or more of the elements of an effective pledge was missing, the pledge would be invalid and unenforceable against such claims. Squillante, 87 Com. L.J. at 621.

From this discussion it is readily apparent that at common law Ellefson's waiver argument would likely carry the day for her. Commenting on this precise issue, one writer has noted:

> [Prior to the adoption of the UCC], [i]f a secured party authorized or acquiesced in his debtor receiving proceeds and depositing them in his bank account, such authorization or acquiescence could well be viewed as inconsistent with the assertion of a security interest. The conduct could be construed as amounting to nothing more than reliance on the debtor's personal promise to pay. The secured party could be said to have "waived" his security interest.... In some states, in fact, if the secured party consented to the debtor's use of any part of the proceeds as his own, the law of mortgages on merchandise applicable to inventory collateral and *Benedict v. Ratner*, 268 U.S. 353 [45 S.Ct. 566, 69 L.Ed. 991] (1924) applicable to accounts collateral would result in loss of the security interest on the remaining original collateral as well.

Robert H. Skilton, *The Secured Party's Rights in a Debtor's Bank Account Under Article 9 of the Uniform Commercial Code*, 1 S. Ill. U. L.J. 120, 129–30 (1977) [hereinafter Skilton]; *see also Kilgore v. State Bank*, 372 Ill. 578, 25 N.E.2d 39 (1939) (holding that garnishing creditor of debtor could reach cash proceeds received by debtor from sale of property subject to conditional sales contract and deposited in debtor's bank account).

Our case law on pledges is consistent with these rules. *See Briley v. Madrid Improvement Co.*, 255 Iowa 388, 122 N.W.2d 824 (1963). In *Briley*, a judgment creditor garnished moneys due the judgment debtor on a real estate contract. The judgment debtor was the vendor under the contract, and the garnishee was the vendee. The debtor had previously pledged and deposited the contract as collateral for the payment of the vendor's note to a bank. This court held that the garnishment did not have priority over the bank's lien. *Id.* at 393–94, 122 N.W.2d at 827.

Finding no applicable statutory provisions, the court applied the common law applicable to pledges and their priorities. *Id.* at 392–93, 122 N.W.2d at 826. The court first determined that a garnishment was not superior to any prior and existing possessory interest, such as a pledge. *Id.* at 390, 122 N.W.2d at 825. The court recognized the common-law rule that, as to personal property capable of physical transfer, transfer of possession had to be made to complete delivery. *Id.* at 392, 122 N.W.2d at 826. As to choses in action, the court recognized that, when a pledgor manually turns over a written assignment of a chose in action to the pledgee, delivery is complete. *Id.* at 392–93, 122 N.W.2d at 826–27. In this instance, delivery was complete when the judgment debtor manually turned over to the bank the real estate contract with the debtor's written assignment on the back of the contract. *Id.* at 395, 122 N.W.2d at 828. Finally, the court noted there were no statutory recording or filing requirements necessary to preserve the bank-pledgee's rights against creditors of the judgment debtor. For this reason, the court determined that all that the bank had to do to preserve its rights against the garnishment claim was to prove the date of the assignment was prior to the garnishment. *Id.* at 392, 122 N.W.2d at 826.

■ Against this background, we turn our attention to the Assignment of Accounts Agreement. Obviously, by the Agreement, Republic tried to establish a pledge, with the bank as its agent holding the two bank accounts as collateral for Centech's debt. There was, however, one glaring defect. Neither Republic nor its agent, the bank, had absolute, unequivocal, and exclusive possession and control of the accounts. Centech had access to the accounts and substantially unfettered right to use the funds as it saw fit. That the Assignment of Accounts Agreement only allowed Centech to make withdrawals in the ordinary course of business does not mean Republic had exclusive possession and control of these accounts. *See Duncan*, 270 S.E.2d at 146 n.11 ("In a bank account where the depositor has access to the account through withdrawal rights, it would be difficult, if not impossible, for the bank to demonstrate that the account constitutes a pledge in the absence of a showing that it has exclusive control over the account.").

Given this defect, Republic and therefore Winnebago, its assignee, had no lien by virtue of any pledge. The district court erred in concluding otherwise.

■ Absent the lien, Republic was, as between it and Ellefson, a mere general creditor as to the two bank accounts and therefore had no rights to them. The situation is no different from the one in which a garnishment is served on a judgment debtor's bank where the debtor has a checking account. In that situation, the right of the judgment creditor is measured by the right of the debtor-depositor. *What Cheer Sav. Bank v. Mowery*, 149 Iowa 114, 117–18, 128 N.W. 7, 8 (1910).

■ Here, the bank was obligated to pay any check Centech wrote and honor any request by Centech for withdrawal of funds from the accounts. By virtue of the garnishment, Ellefson stepped into Centech's shoes. The bank was therefore obligated to honor Ellefson's garnishment unless some other agreement dictated otherwise.

That brings us to the Security Agreement.

**2. The Security Agreement.** The district court found that the Security Agreement granted Republic a security interest in the proceeds from the sale of secured collateral, citing Iowa Code section 554.9306(2). The court also found that "proceeds" are whatever is received upon the sale, exchange, collection, or other disposition of collateral, citing Iowa Code section 554.9306(1). Additionally, there was testimony that virtually all of the proceeds in the accounts came from the disposition of the collateral covered by the Security Agreement. The district court's findings together with this testimony lead us to conclude the district court implicitly found that Republic and Winnebago, as its assignee, had a continuing security interest in the proceeds of the two bank accounts that was superior to that of Ellefson's garnishment claim. If the district court was correct, we may uphold its judgment on this basis.

**a. Status of the Security Agreement under the UCC.** As we did with the Assignment of Accounts Agreement, we must decide the status of the Security Agreement under the UCC. Again, this is a legal question for us to decide.

The Security Agreement granted Republic a security interest in Centech's existing as well as future accounts, inventory, equipment, and "proceeds of any and all of the foregoing property." Republic perfected the security interest by filing a financing statement with the secretary of state. This is important because under the UCC a security interest is not enforceable against the debtor and third parties and does not attach unless (1) the debtor has signed a security agreement containing a description of the collateral, (2) value has been received, and (3) the debtor has rights in the collateral. Iowa Code § 554.9203. Additionally, the creditor must file with the secretary of state a financing

statement regarding the kind of collateral that is involved here. Iowa Code §§ 554.9302, .9401(1)(c).

In this case, it is uncontroverted that all of these requirements were met. Therefore, Republic had a security interest in the collateral mentioned in the Security Agreement and in the proceeds from that collateral. It is also uncontroverted this security interest attached and became a lien on the collateral *before* the garnishment was served.

We have already determined that the UCC does not apply to the creation of an original security interest in a debtor's bank account. However, in *Domain* this court held that pursuant to two UCC provisions—Iowa Code sections 554.9104(*l*) and 554.9306—bank accounts to the extent they include identifiable proceeds from the sale of collateral are subject to the lien that originally encumbered the collateral itself. 230 N.W.2d at 168.

Section 554.9104 pertinently provides:

This article does not apply ... *l.* to a transfer of an interest in any deposit account (section 554.9105, subsection 1), *except as provided with respect to proceeds (section 554.9306)* . ...

(Emphasis added.)

Iowa Code section 554.9306(1) defines "proceeds" to include "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." This provision also defines "cash proceeds" to include "[m]oney, checks, deposit accounts and the like" and "noncash proceeds" to include "[a]ll other proceeds."

Iowa Code section 554.9306(2) provides in relevant part:

[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also *continues in any identifiable proceeds including collections received by the debtor.*

(Emphasis added.)

■ A security agreement therefore allows a creditor a continuing security interest in the proceeds from the sale of collateral even though those proceeds find their way into a bank account. The creditor, however, must identify those proceeds as coming from the sale of the collateral.

With respect to any waiver argument that might be urged because of the commingling of collateral sale proceeds in a bank account, Iowa Code section 554.9205 provides:

A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor ... to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral.

■ This section repeals the rule of *Benedict v. Ratner*, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925), and other cases that held such arrangements void as a matter of law because the debtor was given unfettered dominion or control over the collateral. Iowa Code Ann. § 554.9205 cmt. 1. Therefore, contrary to pre-UCC law, secured creditors under the UCC do not waive their lien on collateral proceeds in the debtor's bank account simply because the creditor allows the debtor to deposit collateral proceeds in the debtor's account and to use those proceeds for carrying on the debtor's business. *Brown & Williamson Tobacco Corp. v. First Nat'l Bank*, 504 F.2d 998, 1001–02 (7th Cir. 1974); *Insley Mfg. Corp. v. Draper Bank & Trust*, 717 P.2d 1341, 1345–46 (Utah 1986) (noting that the purpose of section 9–205 "is to relieve creditors from the age-old requirement of policing collateral in the hands of a debtor"); Skilton, at 130, 136–37; 68A Am.Jur.2d *Secured Transactions* § 94, at 108 (1993). The creditor loses its security interest in the collateral, but its interest remains in the identifiable

proceeds in the bank account. *Insley,* 717 P.2d at 1343; *see also C & H Farm Serv. Co. v. Farmers Sav. Bank,* 449 N.W.2d 866, 873–74 (Iowa 1989) (holding that, when third party purchases collateral from debtor under course of dealing waiver doctrine, secured party has waived its security interest in the collateral but may still pursue proceeds of collateral in debtor's hands). Such continuing security interest or lien, however, may fail if the creditor cannot identify the proceeds in the debtor's bank account as coming from the sale of the collateral covered by the creditor's security agreement. *C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.,* 89 Ill.2d 27, 59 Ill.Dec. 85, 431 N.E.2d 370, 373 (1982).

■ Under these authorities, Republic had a continuing security interest in the proceeds of the two bank accounts to the extent those proceeds came from the sale or other disposition of the collateral covered by the Security Agreement. This continuing security interest was unaffected by (1) Centech's use of those proceeds in its business or (2) Republic's failure to require Centech to account for the proceeds. Therefore, as to the Security Agreement, the district court correctly found that Ellefson had not established her waiver argument.

**b. Identifying or tracing the proceeds.** As mentioned, the district court found that the Security Agreement granted Republic a security interest in the proceeds from the sale or other disposition of the collateral. And we agree with that construction of the Security Agreement. Additionally, it is uncontroverted the security interest attached to the proceeds and was perfected before the garnishment was served.

■ But, as Ellefson points out, the district court did not take the next step to determine whether Winnebago had identified or traced the proceeds in the two bank accounts as coming from the sale or other disposition of the collateral covered by the Security Agreement. Winnebago, as in-

tervenor, had the burden to make that showing. *See Padzensky,* 343 N.W.2d at 469 (holding that, when intervenor claims superior right to garnishment funds, intervenor shoulders the burden to establish the claim). Ellefson contends Winnebago made no attempt at trial to make the necessary identification and, for that reason, failed in its burden to show it had a superior claim to the garnishment funds.

■ We follow what is known as the "lowest intermediate balance rule" for identifying or tracing proceeds in a commingled fund account. *See C & H,* 449 N.W.2d at 877. The rule is that a secured creditor is entitled to the full amount of the proceeds of the secured collateral deposited in a commingled fund account if the balance of the account remains at all times equal to or greater than that amount. *Id.* However, if the account balance is at any time reduced below the amount of the deposited proceeds, the creditor cannot recover more than the lowest balance in the account even though deposits thereafter increase the balance of the account. *Id.*

■ As mentioned, there was testimony that except for several deposits, virtually all of the cash that came into the accounts represented customer payments of accounts receivables generated from the sale of Centech's goods or services. In fact, Ellefson so stipulated before trial. And as Winnebago points out, all but one of the exceptions related to refunds that were covered by the Security Agreement. The remaining exception was the $125,000 loan from Winnebago to Centech made in September 1996. The evidence shows that the $125,000 deposit was made six months prior to the garnishment and that, in the intervening six months, sums far in excess of $125,000 were transferred into and out of the accounts.

Ellefson did not file a motion for enlargement of findings under Iowa Rule of Civil Procedure 179(b). We therefore may assume as fact an unstated finding that is

necessary to uphold the district court judgment. *See Hubby v. State,* 331 N.W.2d 2d 690, 695 (Iowa 1983). The necessary finding to support the district court's ruling that Winnebago's claim is superior is the identification or tracing finding. There is substantial evidence that the funds in the bank accounts at the time of the garnishment came from collateral proceeds. We therefore assume the district court made the necessary finding on the identification issue to support its ruling.

Iowa Code section 554.9201 provides that "[e]xcept as otherwise provided by this chapter a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." It has been said that this provision has two roles: "(1) as a general validation of the terms of the security agreement between the parties, and (2) as a keystone priority rule, tilting the scales in favor of the secured party versus purchasers and creditors of the debtor, in cases not otherwise provided for." Skilton, at 202; *see also* Iowa Code Ann. § 554.9201 cmt.

The Security Agreement gave Winnebago, as assignee of Republic, a security interest in the proceeds of the two bank accounts. That security interest was perfected before the date of the garnishment and was effective against Centech as of that date. As a garnishor, Ellefson had no greater rights to the funds in the accounts than Centech. *See Verschoor v. Miller,* 259 Iowa 170, 177, 143 N.W.2d 385, 389 (1966) (holding that a garnishment is effective only to the extent of the debtor's interest in the property garnished and that the garnishment does not displace prior equities or rights). The Security Agreement is therefore effective against Ellefson and makes Winnebago's claim superior to that of Ellefson. We know of no other provisions in the UCC that provide otherwise. The district court was correct in concluding that Winnebago's security interest in the proceeds of the bank accounts was superior to Ellefson's garnishment claim.

**■ B. Limitation as provided by Iowa Code section 554.9306(4)(d)(ii).** Ellefson attempts to save her claim by contending that Iowa Code section 554.9306(4)(d)(ii) limited Winnebago's security interest in the proceeds of the two bank accounts. The district court rejected this contention, and so do we.

When insolvency proceedings are instituted, the security interest of a creditor holding a perfected security interest in cash proceeds continues as to all undeposited, uncommingled and identifiable cash proceeds. *See* Iowa Code § 554.9306(4)(a)-(c). However, once these cash proceeds are deposited in a general account, the UCC sets out a formula to determine the secured creditor's interest in the commingled account. *See* Iowa Code § 554.9306(4)(d). Section 554.9306(4)(d)(ii) provides:

4. In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

. . . .

d. in all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph "d" is

. . . .

ii. limited to an amount not greater than the amount of cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraph "a" through "c" of this subsection 4.

This provision therefore limits the secured party's security interest to an amount not greater than the amount of any cash proceeds received by the debtor within the last ten days before insolvency proceedings are initiated.

On January 27, 1997, Republic sold assets of North Iowa Electronics to Midwestern Electronics. Those assets were owned by Centech and covered by the Security Agreement. On April 16, 1997, which was approximately three weeks after the garnishment, Winnebago sold to R & D Technical Services assets also owned by Centech and covered by the Security Agreement. The question before the district court was whether the two sales were insolvency proceedings as Ellefson contended they were.

Iowa Code section 554.1201(22) defines "insolvency proceedings" to include "any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate the estate of the person involved."

**1. Assignment for the benefit of creditors.** An assignment for the benefit of creditors "is a voluntary transfer by a debtor of his or her property to an assignee in trust for the purpose of applying the property or proceeds thereof to the payment of his or her debts." 6 Am. Jur.2d *Assignments for Benefit of Creditors* § 1, at 278 (1999). The object of "such an assignment is to afford an equal distribution of the assignor's estate to all of his creditors in proportion to their claims." *Id.* Transactions that appear to be an assignment for the benefit of creditors "may be distinguished on the basis that they lack the element of [a] trust. . . ." *Id.* § 2, at 279.

*Fromme v. Jones,* an early Iowa case interpreting an Iowa statute regulating assignments for the benefit of creditors, generally agrees that these are the characteristics of such an assignment:

A general assignment for the benefit of creditors under this provision is a different thing from that of a chattel mortgage. An assignment passes the property beyond the control of the debtor. It is made in contemplation of insolvency. It requires the intervention of a trustee. If the property assigned is insufficient to pay the whole of the indebtedness, there must be a *pro rata* distribution of the avails of the property assigned.

13 Iowa 474, 481 (1862); *see also Cowles & Co. v. Rickets,* 1 Cole's 546, 549 (Iowa 1855) (holding that a sale by a debtor of substantially all the debtor's property in payment of a single debt was not an assignment for the benefit of creditors because such an assignment "implies a trust, and contemplates the intervention of a trustee, which is incompatible with the idea of a sale absolute").

Here, the Security Agreement granted Republic a security interest in substantially all of Centech's assets. Centech, by executing the Security Agreement, did not transfer its property to a trustee for the purpose of applying the proceeds from the sale of the property equally among all of its creditors. Rather, Centech executed the Agreement to provide Republic security for the debt Centech owed it. The two sales were not made in contemplation of insolvency or to provide a fund to pay all of Centech's creditors in proportion to their claims. Rather, the two sales were made pursuant to the Security Agreement to satisfy Centech's debt to Republic and Winnebago. The sales, therefore, did not constitute an assignment for the benefit of creditors.

**2. Other proceedings intended to liquidate or rehabilitate the estate of the person involved.** This latter part of the insolvency definition, we think, refers to those kinds of proceedings that accomplish the same result that an assignment for the benefit of creditors accomplishes. In reaching that conclusion, we apply a rule of statutory construction known as *"ejusdem generis."* According to this rule, when specific words (here, "assignment for

the benefit of creditors") of the same nature are used in the statute followed by the use of general ones (here, "other proceedings intended to liquidate or rehabilitate the estate of the person involved"), the general terms take their meaning from the specific ones and are restricted to the same kind. *Thompson v. Hancock County*, 539 N.W.2d 181, 184 (Iowa 1995); *State v. Bishop*, 257 Iowa 336, 342, 132 N.W.2d 455, 458 (1965).

 The word "proceeding" injects a limitation as seen from the following definition of the word:

> In its ordinary acceptation, or general sense, ... "proceeding" means the form and manner of conducting judicial business before a court or judicial officer....
>
> ... In a more particular or restricted sense, the term "proceeding," means any application to a court of justice ... for any remedial object.

1A C.J.S. *Actions* § 7(a), at 318–19 (1985). Therefore, the words "other proceeding intended to liquidate or rehabilitate the estate of the person involved" contemplate something similar to an assignment for the benefit of creditors with the additional requirement that that something has to be under the supervision of a court.

We find support for our conclusion in those instances when courts have applied provisions comparable to section 554.9306(4)(d)(ii). All have involved bankruptcies, *see, e.g., In re SMS, Inc.*, 15 B.R. 496, 500 (Bankr.D.Kan.1981), or receiverships where they have been instituted to liquidate or rehabilitate the debtor's estate, *see, e.g., Cimarron Nursing Center v. F.G. Armstrong*, 143 B.R. 578, 580 (Bankr. W.D.Okla.1992). Conversely, a seizure by IRS officials of a company's assets to enforce a tax lien is not a commencement of an insolvency proceeding. *First Nat'l Bank of Ft. Worth v. United States*, 8 Cl.Ct. 774, 779 (1985).

Because the sales here did not constitute an assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate Centech's estate, the limitations under section 554.9306(4)(d)(ii) have no application to this case. *See Citizens Nat'l Bank v. Mid–States Dev. Co.*, 177 Ind.App. 548, 380 N.E.2d 1243, 1246 (1978) (holding that limitations under the UCC provision identical to section 554.9306(4)(d)(ii) had no application outside the area of insolvency proceedings; and therefore, the trial court properly disregarded them). The district court did not err in refusing to apply the statute.

### IV. Disposition.

In sum, we conclude Winnebago, as assignee of Republic, had a continuing security interest in the proceeds of the two bank accounts. That interest was superior to Ellefson's garnishment claim. The two sales of Centech's assets were not an assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate Centech's estate. Therefore, Iowa Code section 554.9306(4)(d)(ii) had no application to this case. The district court did not err in authorizing the bank to release the funds in the two bank accounts to Winnebago, the intervenor.

**AFFIRMED.**

LARSON, J., concurs in the result only.